# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 12-190-02 |
| MATTHEW McMANUS | : | |

## ORDER

And now, this _____ day of _____, 2014, upon consideration of defendant's Motion for Judgment of Acquittal and New Trial Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, and the government's response thereto, it is ORDERED that: (1) defendant's Rule 29 Motion for acquittal on Counts Seventeen through Nineteen, Thirty-Two, and Thirty-Three is DENIED; and (2) defendant's Rule 33 Motion for a new trial on Counts Seventeen through Nineteen, Thirty-Two and Thirty-Three is DENIED.

BY THE COURT:

_____
HONORABLE WILLIAM H. YOHN, JR.
*Senior Judge, United States District Court*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

      v.          :          CRIMINAL NO.   12-190-02

MATTHEW McMANUS          :

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTIONS FOR ACQUITTAL AND/OR NEW TRIAL

The United States of America, by its attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and David L. Axelrod, Assistant United States Attorney, respectfully responds to defendant Matthew McManus's motions for acquittal and/or new trial on Count Two, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.   There was sufficient, if not overwhelming, evidence for the jury to find McManus guilty beyond a reasonable doubt on Counts Seventeen through Nineteen, Thirty-Two, and Thirty-Three, and McManus has failed to meet the burden necessary to justify acquittal or a new trial on any of these counts.

## I.          PROCEDURAL HISTORY

On April 28, 2012, a grand jury in the Eastern District of Pennsylvania returned an indictment charging defendant Matthew McManus and five other defendants with various charges stemming from their involvement in a large advance fee fraud scheme.   Every defendant but McManus pled guilty.   The following chart reflects the counts charging McManus with violations of federal law:

| Count | Charge |
|---|---|
| One | Conspiracy to commit mail and wire fraud (18 U.S.C. § 371) |
| Three | Wire fraud (18 U.S.C. § 1343) |
| Four | Wire fraud (18 U.S.C. § 1343) |
| Six | Wire fraud (18 U.S.C. § 1343) |
| Seventeen | Money Laundering (18 U.S.C. § 1957) |
| Eighteen | Money Laundering (18 U.S.C. § 1957) |
| Nineteen | Money Laundering (18 U.S.C. § 1957) |
| Thirty-Two | Obstruction of justice (18 U.S.C. § 1505) |
| Thirty-Three | False statements to a federal officer (18 U.S.C. § 1001) |

Prior to the start of trial the government moved to dismiss Count Three.

On January 23, 2014, the trial began, and on February 19, 2014, after three hours of deliberation, the jury convicted McManus of all counts.   McManus then filed the instant motion seeking a judgment of acquittal pursuant to Rule 29(c), or a new trial pursuant to Rule 33, on Counts Seventeen through Nineteen, Thirty-Two, and Thirty-Three.   In connection with these motions McManus filed a Memorandum of Law in Support of Motion for Judgment of Acquittal (hereinafter "McManus Mem."). Dkt. 315-1.

## II.   APPLICABLE LEGAL STANDARDS

### A.   Motion for Judgment of Acquittal Pursuant to Rule 29

Federal Rule of Criminal Procedure 29 ("Rule 29") provides that the district court, upon the motion of a defendant or upon its own motion, shall enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses."   Fed. R. Crim. P. 29(a).   In ruling on a Rule 29 motion, the district court must determine whether any rational trier of fact could have found proof of the defendant's guilt beyond a reasonable doubt based upon the available evidence presented at trial.   *See United States v. Smith*, 294 F.3d 473, 478 (3d Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).   The Third Circuit has

cautioned, however, that the district court "be ever vigilant in the context of . . . [a Rule 29 motion] not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (internal citation omitted).

The Court must view the evidence as a whole, and in the light most favorable to the government. *United States v. Hoffecker*, 530 F.3d 137, 146 (3d Cir. 2008). The government is further entitled to "the benefit of inferences that may be drawn from the evidence[,] and the evidence may be considered probative even if it is circumstantial." *United States v. Patrick*, 985 F. Supp. 543, 548 (E.D. Pa. 1997) (citing *United States v. Pecora*, 798 F.2d 614, 618 (3d Cir. 1986)); *see also United States v. Griffith*, 17 F.3d 865, 872 (3d Cir. 1994) ("It has long been recognized . . . that circumstantial evidence . . . can be sufficient to support a jury's determination.").

The proponent of a Rule 29 motion, therefore, bears a heavy burden to prove that the evidence presented by the government during trial was insufficient to support the verdict. *See United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990) (citation omitted). In fact, the Third Circuit has held that acquittal should "be confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984) (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)). "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Punigitore*, 910 F.2d 1084, 1129 (3d Cir. 1990). Accordingly, "[a] verdict will be overruled only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v.*

3

*Salmon*, 944 F.2d 1106, 1113 (3d Cir. 1991); *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987).

### B.    Motion for New Trial Pursuant to Rule 33

Rule 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interests of justice so require." Fed. R. Crim. P. 33(a). While the text of the Rule plainly allows the Court to grant a defendant a new trial, the Third Circuit has severely limited when and how Rule 33 should be used. "Motions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (citations omitted). Motions for a new trial under Rule 33 are appropriate "only if [the court] believes that there is a serious danger that a miscarriage of justice has occurred-that is, that an innocent person has been convicted." *Id.* (citations omitted).

### III.    <u>McMANUS CANNOT PREVAIL UNDER EITHER RULE 29 OR 33</u>

McManus does not challenge the jury's guilty verdict on Counts One (conspiracy to commit mail and wire fraud), or Counts Four and Six (wire fraud). Rather, McManus contends that he must be: (1) acquitted or granted a new trial on Counts Seventeen through Nineteen (money laundering) because the government did not introduce evidence showing that Home National or Republic First Bank was insured by the FDIC, McManus Mem. at 2-3; (2) acquitted or granted a new trial on Counts Seventeen and Eighteen (money laundering) because the government failed to prove the requisite interstate commerce element, McManus Mem. at 3-5; (3) acquitted or granted a new trial on Count Thirty-Three (false statements) because the government failed to prove that the McManus' statement was false, McManus Mem. at 5-7; and (4) acquitted or granted a new trial on

4

Count Thirty-Three (obstruction of justice) because the government failed to prove that the statements McManus made in his emailed document – "Bluestone FAQ – Responses to Questions re RFG" – were false, McManus Mem. at 7-8.   Each of these arguments is meritless.

### A.    The Government Proved that the "Monetary Transactions" in Counts Seventeen through Nineteen Occurred Through a "Financial Institution."

McManus contends that he must be acquitted or granted a new trial on Counts Seventeen through Nineteen because the government failed to show that the monetary transactions in questions occurred through a financial institution.   Specifically, McManus claims that the government "did not introduce the Federal Deposit Insurance Commission ("FDIC") certificates for either bank, and introduced no other evidence from which the jury could have concluded that the bank[s] met the highly-technical statutory and regulatory definition of 'financial institution.'" McManus Mem. at 3.   McManus' argument is critically flawed.

To establish a violation of 18 U.S.C. § 1957, as charged in Counts Seventeen through Nineteen, the government was required to prove McManus "knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from a specified unlawful activity . . . ."   18 U.S.C. § 1957(a).   "[M]onetary transaction" is further defined as a "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds . . . by, through, or to a *financial institution* (as defined in section 1956 of this title) . . . ."   18 U.S.C. § 1957(f)(1) (emphasis supplied).[1]

---

[1]   The Court's instructions were in accord with the statute and McManus does not argue otherwise.   Tr. Feb. 19, 2014 at 53:71-54:4.   The Court did not instruct the jury on the definition of a "financial institution," and McManus did not object to this omission.   A purported error in the jury instructions is reviewed on appeal for "plain error."   *United States v. Antico*, 275 F.3d 245, 265 (3d Cir. 2001).   "Orderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an

The government does not need to show that the entities involved in the monetary transactions were FDIC-insured banks as McManus contends.   Contrary to McManus' assertion, the term "financial institution" is defined broadly.   For purposes of this statute, a "financial institution" means: "an insured bank (as defined in section 3(h) of the Federal Deposit Insurance Act (12 U.S.C. 1813(h))); a commercial bank or trust company; a private banker," or a number of other entities.[2]   31 U.S.C. § 5312(a)(2).   There is no statute or case that interprets the term "financial institution" this narrowly, and McManus fails to cite any such authority.   *See United States v. Thomas*, No. 05-30229, 2006 WL 1049043, at **2-3 (5th Cir. Apr. 20, 2006) (non-precedential) (holding that government did not have to prove bank was FDIC-insured to show it met definition of "financial institution").

Counts Seventeen through Nineteen charged McManus with depositing checks drawn on Remington's Republic First Bank and Home National Bank accounts.   The government introduced sufficient evidence for the jury to conclude that each of these banks was a "commercial bank."[3]   31 U.S.C. § 5312(a)(2).   The government is not aware of any case that has specifically defined "commercial bank" in this context and McManus does not cite any.   However, the evidence introduced at trial was sufficient for the jury to conclude that Republic First Bank and Home National Bank were "commercial banks" as this term is commonly used.   The jury heard

---

accurate charge and to minimize the risk of committing reversible error.   It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

[2] Pursuant to 18 U.S.C. § 1956, the term "financial institution" includes "any financial institution, as defined in section 5312(a)(2) of title 31, United States Code . . . ." 18 U.S.C. § 1956(c)(6).

[3] The jury also saw evidence that each of these checks was deposited into McManus' account at Citizens' Bank.   GX 4001A, 4001B, 4002A, 4002B, 4003A, 4003B.   The jury could have rightly determined from this evidence that Citizens' Bank was a commercial bank, and thus a financial institution.

6

that Remington used these banks: (1) to collect the advanced fees it charged, Tr. Jan. 31, 2014 at 246:19-249:24, GX 11A (Bluestone 2007 Gen. Ledger) at 39-53 ("Phase 1" or LOI fees), 55-61 ("Phase 2" or term sheet fees); and (2) pay employees and brokers, *id.* at 64-92.   The jury also saw the "signature cards" used by Bogdanoff and McManus to open these accounts.   GX 5004E (Home National), 7002A (Republic First).   And the jury saw checks drawn on these accounts.[4] GX 4001B and 4002B (Republic First), 4003B (Home National Bank).   Based on this evidence a rational juror could certainly have concluded that Republic First and Home National were commercial banks and, thus, financial institutions as defined by the relevant statute.

Viewed in the light most favorable to the government, it is clear that the government proved that McManus "knowingly engaged in a monetary transaction" as required by the statute.   *See* 18 U.S.C. §§ 1957(a), (f)(1).   McManus has failed to justify his acquittal on these charges, and certainly has provided no basis for the Court to conclude he is entitled to a new trial, pursuant to Rule 33.

**B.      The Government Proved that the Monetary Transactions in Counts Seventeen and Eighteen Occurred in or Affecting Interstate Commerce.**

McManus next contends that the government failed to prove that the monetary transactions in Counts Seventeen and Eighteen (the Republic First transactions) satisfied the requisite interstate commerce element.   In making this argument, McManus ignores the overwhelming evidence showing Remington successfully solicited advance fee from customers throughout the United States and internationally, and this money was wired to Remington's Republic First account in Philadelphia.   This fact alone satisfied the interstate commerce element

---

[4] Steven Shotz also testified that he founded Republic First Bank.   Tr. Jan. 31, 2014 at 101.   Indeed he testified that he served on the loan committee for the Bank for 20 years and described specifically what a bank's loan committee does.   *Id.* at 135:25-137:10.

of 18 U.S.C. § 1957.

Again, to prove McManus guilty of money laundering, in violation of 18 U.S.C. § 1957, the government was required to prove McManus "knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from a specified unlawful activity . . . ." 18 U.S.C. § 1957(a). A "monetary transaction" is defined as a "deposit, withdrawal, transfer, or exchange, *in or affecting interstate or foreign commerce*, of funds . . . by, through, or to a financial institution (as defined in section 1956 of this title) . . . ." 18 U.S.C. § 1957(f)(1) (emphasis supplied). McManus contends that the government failed to show the monetary transactions at issue occurred "in or affecting interstate or foreign commerce." Br. 3-4.

McManus correctly notes that the Court instructed the jury that the government could satisfy the interstate commerce element by showing: the banks were FDIC insured, the source of the funds used in the transactions affected interstate commerce, or the transaction involved an interstate transfer. Tr. Feb. 19, 2014 at 54:17-55:3. However, McManus is incorrect when he contends that the government failed to prove this element. Indeed, there was overwhelming evidence that the source of funds "affected interstate commerce."

In 2007 Remington used its Republic First account to collect "term sheet fees," the second advance fee Remington solicited from its victims. Bluestone's general ledger, admitted into evidence at trial, recorded these deposits into the Republic First account. GX 11A at 55-61. The two transactions charged in Counts Seventeen and Eighteen were checks deposited by McManus into his personal account, written on April 25, 2007 and August 9, 2007, and drawn on this Republic First account on June 4, 2007 and August 16, 2007, respectively. GX 4001B and

8

4002B.   A cursory review of the general ledger prior to June 5, 2007, shows Remington received the following payments into this account: (1) on April 9, 2007, Remington received a $15,000 term sheet fee from "Cartersville, GA"; (2) on April 17, 2007, Remington received a $15,000 term sheet fee from "Meridian Idaho"; and (3) on May 16, 2007, Remington received a $15,000 term sheet fee from "Jersey City Investments."   GX 11A at 57.   Similarly, a review of the general ledger prior to August 16, 2007, indicates Remington received the following payments into this account: (1) on June 25, 2007, Remington received a $15,000 term sheet fee from "South Beach Vistas"; (2) on July 11, 2007, Remington received a $15,000 term sheet fee from "Los Angeles Super [sic] Club"; (3) on July 18, 2007, Remington received a $17,000 term sheet fee from "Las Olas of Panama"; (4) on July 19, 2007, Remington received a $15,000 term sheet fee from "V Strategic Group of Miami"; and (5) on August 6, 2007, Remington received a $15,000 term sheet fee from "Kansas Gas Lease Purchase."   GX 11A at 58.

These transactions are simply a sample of the recorded term sheet fees that based on their description in the general ledger appear to be interstate or foreign transactions.   When the list of term sheet transactions in the general ledger is cross-referenced with GX 5000D (the Remington victim list for 2007),[5] and GX 67 (Gura Pipeline Report),[6] it is apparent that many more of these transactions involve transfers in interstate and foreign commerce.   For instance, on May 17, 2007, Remington received a $15,000 term sheet fee from "Blue Heron Gold [sic] Course."   GX 11A at 57.   The Remington victim list for 2007 indicates that "Blue Heron" was a project in Sebering, Florida.   GX 5000D at 3.   Similarly, on July 29, 2007, Remington received a

---

[5] GX 5000D is a spreadsheet summarizing information from Remington's customer files seized on March 15, 2011.   Tr. Jan. 30, 2014 at 208:3-215:12.
[6] GX 67 is a spreadsheet that Remington employee Daniel Gura maintained during the time he worked for Remington.   Tr. Jan. 29, 2014 at 223:8-235:20.

$15,000 term sheet fee from "Ossawinamakee Project."  GX 11A at 58.  The Remington victim list for 2007 indicates that the Ossawinamakee Project was a venture located in Maple Grove, Minnesota.  GX 5000D at 5.  This evidence is alone sufficient to show that the source of the funds for the transactions in Counts Seventeen and Eighteen "affected interstate commerce."

To prove the interstate commerce element of a violation of 18 U.S.C. § 1957 the government is only required to show a "minimal effect" on interstate commerce.  Tr. Feb. 19, 2014 at 54:14-54:16.  *United States v. Ripinsky*, 109 F.3d 1436, 1444 (9th Cir. 1997); *United States v. Leslie*, 103 F.3d 1093, 1101 (2d Cir. 1997) (applying standard in context of 18 U.S.C. § 1956; *United States v. Aramony*, 88 F.3d 1369, 1386 (4th Cir. 1996) (holding that proof of *de minimis* effect on interstate commerce is necessary to prove money laundering).  *Cf. United States v. Kelley*, 929 F.2d 582, 586 (10th Cir. 1991) (citations omitted).  *See also United States v. Walker*, 657 F.3d 160, 180 (3d Cir. 2011) (holding that in Hobbs Act robbery context effect on interstate commerce need only be *de minimis*).

The case of *United States v. Wright* is instructive.  341 Fed. Appx. 709 (2d Cir. 2009) (non-precedential).  In that case Wright was convicted of narcotics crimes and a violation of 18 U.S.C. § 1957, based on the allegation that Wright used drug proceeds to lease a Cadillac.  *Id.* at 713.  Wright argued that the 1957 conviction must be reversed because there was insufficient evidence to show the required "affect on interstate commerce."  *Id.* at 711.  The court disagreed, finding that the government only needed to show "minimal effect" on interstate commerce, which was satisfied because Wright traveled from New York to New Jersey to enter into a lease agreement.  *Id.* at 713-14.

10

The evidence in this case is substantially stronger.   Numerous witnesses testified that Remington solicited LOI and term sheet fees from throughout the United States and many foreign countries.   And in 2007 these term sheet fees were deposited into Remington's account at Republic First Bank.   The source of the funds for the monetary transactions in Counts Seventeen and Eighteen were these advance fees from Remington victims throughout the United States and in other countries.   Accordingly, viewed in the light most favorable, the government clearly established the interstate nexus element of the Republic First money laundering charges.   There is no basis to acquit defendant on these charges, and certainly no "serious danger that a miscarriage of justice has occurred," justifying a new trial.   *Brennan*, 326 F.3d at 189 (citations omitted).

C.    **The Evidence Overwhelmingly Established that McManus' Statement to Federal Agents on July 26, 2011 was False.**

In Count Thirty-Three the indictment charged McManus with lying to federal agents on July 26, 2011 when he stated that he was "only an independent contractor and never was an owner of Remington."   McManus contends that he should be acquitted on this charge because the government failed to show that this statement was not literally true.   McManus overlooks the overwhelming evidence presented at trial establishing that he was both a Remington owner and a W-2 employee.

To prove the crime of making false statements to a federal agent the government was required to prove: (1) that [the accused] made a statement or representation; (2) that the statement or representation was false; (3) that the false statement was made knowingly and willfully; (4) that the statement or representation was material; and (5) that the statement or representation was made in a matter within the jurisdiction of the federal government.   *United States v. Castro*, 704 F.3d 125, 139 (3d Cir. 2013) (citation omitted).   The government's evidence

11

satisfied each element but McManus only contests that the government failed to show that the statement or representation was false.   McManus Mem. at 5.

This charge was based on the lies McManus told to two FBI agents on July 26, 2011.   Specifically, FBI Special Agent Murphy testified that during this interview McManus stated that "he was only an independent contractor and never was an owner of Remington."   Tr. Feb. 7, 2014 at 257:25-259:8, 263:21-264:4.   The evidence introduced at trial showed conclusively that this statement was false in two respects; McManus had been a Remington owner and a W-2 employee.

Regarding McManus' ownership, the government introduced into evidence: (1) Remington's Arizona corporate statements, showing that McManus owned a portion of Remington between 1998 and 2008, GX 2A-2C, 2E-2F, 2H-2K; (2) Remington's corporate tax returns showing that from at least 2005 to 2007 McManus was a 50% owner (and officer) of the company, GX6001, 6002, 6003; (3) McManus' personal tax returns from 2005 to 2006 reporting that he was a Remington owner, GX6021, 6022; (4) McManus's sworn testimony from earlier depositions in which he testified under oath he was a Remington owner, Tr. Feb. 11, 2014 at 109:10-111:15, 111:21-115:11, 116:14-118:13; (5) testimony from Shayne Fowler, Tr. Jan. 24, 2014 at 46:11-46:25; Joel Nathanson, Tr. Jan. 28, 2014 at 9:7-9:17; Tyler Hufford, Tr. Jan. 29, 2014 at 12:10-12:22; Deborah Avanesov, Tr. Jan. 31, 2014 at 227:18-227:24; Steven Shotz, Tr. Jan. 31, 2014 at 104:2-105:3; Kris Wood, Tr. Feb. 6, 2013 at 138:20-138:25; and Andrew Benioff, Tr. Feb. 6, 2013 at 18:17-18:24, that McManus and Bogdanoff were the owners of Remington; (6) a personal financial statement submitted by McManus to Republic First Bank claiming a "90" percent ownership in Remington, GX 1112; and (6) an October 2008 letter from McManus'

12

attorney to Remington's accountant stating, "I am able to confirm that Matthew McManus ceased to have an ownership interest in Remington Financial Group, Inc. as of January 1, 2007," GX 87.

The jury also received overwhelming evidence that McManus was a Remington W-2 employee and not a Remington independent contractor.   Numerous witnesses testified that McManus ran Remington and more importantly, McManus' W-2s were admitted into evidence. GX 6021 at 3, 6022 at 3, 6023 at 3, 6024 at 3.   Remington's accountant also testified that McManus was a W-2 employee and not an independent contractor.   Tr. Feb. 4, 2014 at 253:16-254:14.   Indeed, on April 11, 2008, McManus had his assistant request his W-2 (and K-1) from Remington's accountant.   GX 82B.

As the Court instructed the jury, literal truth is a defense to a charge of lying to the federal government.   *Castro*, 704 F.3d at 139.   The government overwhelmingly showed the jury that McManus' statement to FBI Special Agents Murphy and Chambers was not literally true. Accordingly, there is no basis to acquit McManus on this charge.

McManus also argues that he is entitled to a new trial on Count Thirty-Three because his attorney, Mark Haltzman told him in March 2011 "that as far as the corporate records of RFG are concerned you were never issued stock."   DX 111 (hereinafter "the Haltzman advice.").   This argument is meritless.

As described above, the evidence that McManus had been a Remington owner and W-2 employee was overwhelming.   The Haltzman advice did nothing to change this.   The substance and timing of the Haltzman advice was incredibly suspicious and raised serious doubts about the credibility of this "advice."   McManus' attorney had previously sat in depositions where McManus testified under oath that he was a Remington owner.   GX 1111A at 3, 42; GX

13

1111B at 3, 4. And in October 2008, Haltzman wrote a letter to Remington's accountant stating, "I am able to confirm that Matthew McManus ceased to have an ownership interest in Remington Financial Group, Inc. as of January 1, 2007." GX 87. Clearly in 2008 Haltzman believed McManus had at one time been a Remington owner.

The timing of this advice was just as suspicious. On March 15, 2011 the FBI executed search warrants at Remington's offices in Arizona and Colorado. Tr. Feb. 7, 2014 at 254:25-255:17, and two days later Haltzman advised McManus that he was not a Remington owner. As the government argued at trial, this was the culmination of McManus' attempt to distance himself from Remington. Beginning in 2007 as Remington complaints increased, McManus attempted to distance himself from that company. After the June 2008 article in the Wall Street Journal these efforts intensified and concluded with Haltzman's letter to Remington's accountant on October 13, 2008 stating that McManus's ownership ceased on January 1, 2007. GX 87. However, McManus had continued to run Remington with Bogdanoff and share in Remington's profits throughout 2008. GX 1110.

Based on all the other evidence introduced at trial (including McManus' incredible testimony) the jury could (and did) reasonably conclude that: (1) the Haltzman advice was a ruse concocted by McManus and Haltzman to provide McManus plausible deniability; or (2) McManus knew the Haltzman advice was erroneous but he did not care because it provided him greater distance from Remington and the FBI's investigation. To grant McManus a new trial on this count the Court would need to conclude "that there is a serious danger that a miscarriage of justice has occurred-that is, that an innocent person has been convicted." *Brennan*, 326 F.3d at 189. There is no danger that McManus has been wrongly convicted on Count Thirty-Three.

14

**D.** **The Evidence Overwhelmingly Established that McManus' Intended to Obstruct Justice When he Emailed His Co-Conspirators the Document Titled "Bluestone FAQ – Responses to Questions re RFG."**

In Count Thirty-Two McManus was charged with obstruction of justice based on his attempt to interfere with the investigation by the FBI and IRS.   Specifically, McManus was charged with obstruction for emailing a document titled "Bluestone FAQ – Responses to Questions re RFG," (hereinafter "Bluestone FAQ") that contained false information about McManus' role in Remington.   Indictment at 57, GX 2304.   The government's theory, which the jury implicitly adopted through its guilty verdict, was that McManus sought to have his co-conspirators provide false information to government agents when they were inevitably interviewed during this investigation.

In order to prove obstruction of justice in violation of 18 U.S.C. § 1505, the government was required to prove the following essential elements beyond a reasonable doubt: (1) there was a proceeding pending before a department or agency of the United States; (2) the defendant was aware of the pending proceeding; and (3) the defendant intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding.   Tr. Feb. 19, 2014 at 59:9-59:18.   *See also United States v. Atlantic States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453, 538 n.100 (D.N.J. 2009); *United States v. Bhagat*, 436 F.3d 1140, 1147 (9th Cir. 2006); *United States v. Quattrone*, 441 F.3d 153, 174 (2d Cir. 2006).[7]

McManus does not contend that the government failed to prove each of these elements.   Instead, McManus argues that the government was required to prove "falsity" in connection with this obstruction charge, based on the ruling in *Castro* and the government's

---

[7] The Third Circuit has no model instruction for a violation of 18 U.S.C. § 1505.

theory.   McManus Mem. at 7.   McManus provides no legal support for this argument beyond the

citation to *Castro* and did not ask for the inclusion of this element in the applicable jury

instructions.   However, even if this were the state of the law McManus' conviction on Count

Thirty-Two would survive easily.

    The evidence at trial plainly showed that the Bluestone FAQ was false.   The

Bluestone FAQ contained the following six separate statements:

> [Statement One]:
> **What is Bluestone Real Estate Capital?**
> BlueStone Real Estate Capital is a commercial real estate investment banking firm that
> secures innovative debt, mezzanine, equity and sponsor equity financing for the nation's
> top-tier investors, operators, owners and developers.
>
> [Statement Two]:
> **Are Bluestone and Remington Financial Group the same company?** No. Bluestone
> Real Estate Capital and Remington Financial Group/Remington Capital are two
> completely separate companies and never were the same. ·
>
> [Statement Three]
> **What is the relationship between the companies?**
> There is no relationship between the two firms.   The confusion in the market place stems
> from the existence of Remington Financial Group, Inc. a Pennsylvania company and
> Remington Financial Group of Arizona.   When RFG of Arizona began to grow, so did the
> confusion.   Therefore, the principal and executives of Remington PA left Remington of
> PA and formed Bluestone Real Estate Capital to denote its distinction from RFG Arizona
> and from the RFG name altogether.   Bluestone's focus is on the institutional caliber client.
> As far as Bluestone knows, Remington of PA ceased its existence when Bluestone was
> formed.
>
> [Statement Four]
> **Is Bluestone under investigation by the FBI?   The Department of Corporations in**
> **California?**
> Absolutely not. I am not aware of any investigation by the FBI or the Department of
> Corporations in California.
>
> [Statement Five]
> **How is Matthew McManus affiliated to RFG?**   Matthew McManus is a former
> Remington of PA independent contractor.   McManus left Remington in 2006 with other
> Remington of PA producers to launch Bluestone Real Estate Capital, a real estate

investment banking firm that focuses on securing financing for the nation's top-tier real
estate companies.

[Statement Six]
**How many successful loans has RFG AZ and Bluestone closed?**
RFG of Arizona did refer some financing opportunities for a short period of time to
Bluestone and Bluestone successfully secured financing on behalf of Remington of AZ's
clients.  After the June 08 Wall St Journal article, Bluestone ceased all business dealings
with RFG of Arizona. Bluestone, since its inception, has secured billions in financing for
its clients.

GX 2304.

The government introduced evidence showing that Statements Two, Three, Five,

and Six were false.  With respect to the falsity of Statement Two, witnesses testified that from

2007 until 2008 Remington and Bluestone were effectively the same company, just operating

under different names.  Tr. Jan. 29, 2014 at 217:25-219:10 (Gura); Tr. Jan. 31, 2014 at

242:17-243:18 (Avanesov); Tr. Feb. 4, 2014 at 53:23-54:5 (Avanesov testified that after Bluestone

was formed the Philadelphia office continued to work on Remington deals).   Indeed, the financial

records that McManus had his bookkeeper create combined Remington and Bluestone.  *See, e.g.*

GX 3501A, 3501G, 3605, 3605A, 3605B, 3605C, 3800.   These were just a few of the financial

documents created at McManus' request that combined Remington and Bluestone, and the

Arizona and Philadelphia operations.

The evidence demonstrated that Statements Three and Five were also false.

Remington was a company with two offices -- in Arizona and Philadelphia.   GX 5200

(Remington organization chart), 5201 (illustration of "Arizona Pipeline"); Tr. Jan. 30, 2014 at

18:8-22:4 (Gura describing GX 5201), 27:8-32:22 (Gura describing GX 5200).   There were not

two separate companies – Remington Financial Group, Inc. and Remington Financial Group of

Arizona.   Rather, there was one Remington Financial Group and McManus was an owner from at

17

least 1996 to 2007 by his own testimony, and a Remington W-2 employee until 2008. Additionally, McManus' claim that he left "Remington of PA" in 2006 to form Bluestone is also completely false.  Rather, even after McManus formed Bluestone he remained a fifty percent owner of Remington, a Remington W-2 employee, and held himself out as President of Remington.

Finally, Statement Six was also shown to be false.  Remington did not "refer some financing opportunities for a short period of time to Bluestone . . . ."  Rather, the Philadelphia office that held the Remington/Bluestone employees worked on every deal originated out of the Remington Arizona office.  GX 5201.  The Philadelphia office sold the term sheet to these customers and supervised the sham due diligence process.  *Id.*

In summary, the evidence at trial established every element of a violation of 18 U.S.C. § 1505, and demonstrated the falsity of the statements in the Bluestone FAQ.  McManus has no grounds for acquittal on this count.

In the alternative, McManus argues that he should be granted a new trial on Count Thirty-Two, because the information included in the Bluestone FAQ was based on the Haltzman advice.  There is no legal support for this argument.  But the more significant problem with this argument is that it is factually wrong.  As discussed above, Haltzman only told McManus that the Remington corporate records did not reflect he was a shareholder.  Nothing Haltzman said related to Statements Two, Three, Five, or Six in the Bluestone FAQ.  In addition, McManus does not meet the substantial burden necessary to justify a new trial.  This argument can be summarily rejected.

18

## IV.    CONCLUSION

For the reasons set forth above, the government respectfully requests that this

Court: (1) deny defendant's Rule 29 Motion for acquittal on Counts Seventeen through Nineteen,

Thirty-Two, and Thirty-Three; and (2) deny defendant's Rule 33 Motion for a new trial on Counts

Seventeen through Nineteen, Thirty-Two, and Thirty-Three.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

DAVID L. AXELROD
Assistant United States Attorney

19

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within Government's Opposition

has been served by electronic filing and/or United States mail upon the following:

Lisa A. Mathewson, Esq.
The Offices of Lisa A. Mathewson LLC
123 South Broad Street, Suite 810
Philadelphia, PA 19109
*Counsel for Matthew McManus*

DAVID L. AXELROD
Assistant United States Attorney

DATED: 6/17/14

20