# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :
                                  :      CRIMINAL ACTION
                                  :
        v.                       :
                                  :
MATTHEW McMANUS            :      NO. 12-190-2
                                  :

## MEMORANDUM

YOHN, J.                                                                September 2, 2014

On February 19, 2014, defendant Matthew McManus was convicted by a jury of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371 (Count 1), two counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 4 and 6), three counts of money laundering in violation of 18 U.S.C. § 1957 (Counts 17-19), obstruction of justice in violation of 18 U.S.C. § 1505 (Count 32), and making false statements to the federal government in violation of 18 U.S.C. § 1001 (Count 33) for his involvement in an advance fee fraud scheme with five co-conspirators who have all pleaded guilty.

McManus was the co-owner of Remington Financial Group ("Remington"), which held itself out as a company that could provide financing to borrowers seeking loans for commercial projects ranging from multi-million dollar real estate deals to movie productions. Remington offered to connect borrowers to financing, but required borrowers to pay advance fees in order to receive the promised funding. In reality, Remington failed to secure, or even attempt to secure, financing for the vast majority of borrowers who paid these advance fees. Ultimately, McManus, his co-owner and partner Andrew Bogdanoff, and their employees at Remington collectively defrauded 1946 people out of $26 million by collecting advance fees based on the promise of financing that was never available and would never arrive.

McManus now brings post-trial motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) ("Rule 29"), or in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33"), challenging his convictions for money laundering (Counts 17-19), making false statements to the federal government (Count 33), and obstruction of justice (Count 32).  For the reasons discussed below, I will deny the motions.

## I. BACKGROUND

The evidence at trial showed that Remington operated a business model whereby a borrower could ostensibly secure funding by following a two-step due diligence process.  Tr. Jan. 24, 2014 at 54:1-4.  After an intake in which the borrower provided basic information about the project to be financed, a Remington employee sent the borrower a Letter of Interest ("LOI). *Id.* at 57:15-57:25, 59:16-59:18.  If the borrower paid a nonrefundable fee ranging from $5000 to $10,000 the borrower proceeded to the next phase in which a Remmington analyst purportedly conducted the first due diligence process and prepared a Phase I report.  *Id.* at 72:6-72:20, 89:4-89:13, 94:14-94:20.  Following this report, the borrower received a term sheet.  *Id.* at 96:8-96:13.  If the borrower paid a second nonrefundable fee ranging from $10,000 to $15,000, the borrower proceeded to the next phase in which a Remmington analyst purportedly conducted further due diligence.  *Id.* at 98:8-96:13, 127:20-127:21, 132:7-132:10.  At the end of this process the analyst prepared a further report that was meant to be "investor-ready."  *Id.* at 138:2-138:4.

Remington operated primarily out of two offices.  The office located in Scottsdale, Arizona, was run by Bogdanoff; the office located in Philadelphia, Pennsylvania was run by McManus.  Tr. Feb. 7, 2014 at 234:9-234:21; Feb. 11, 2014 at 117:23-118:10; Feb. 6, 2014 at 28:6-28:25.  The Arizona office originated the bulk of Remington's deals, conducting the intake process and sending LOIs to potential customers.  Tr. Jan. 29, 2014 at 201:22-201:27; 208:12-

208:18.  Philadelphia operated as a "back office" for many of the projects originated in Arizona, with Philadelphia's analysts conducting much of the due diligence for Remington.[1]  Jan. 24, 2014 at 95:13-95:15; Tr. Feb. 10, 2014 at 175:6-176:1.  The projects originating in Arizona and transferred to Philadelphia were known as the "Arizona pipeline."  Tr. Jan. 29, 2014 at 203:3-203:5.  The government argued at trial that the due diligence process employed by the Arizona office and the Arizona pipeline in the Philadelphia office was ultimately a scheme devised to secure the nonrefundable advance fees from borrowers who paid those fees believing that Remington was genuinely seeking financing for their projects.

The government offered evidence showing how Remington's scheme successfully lured borrowers into paying these advance fees by implying or stating that investors were already interested in their projects and that financing was imminent, despite the fact that no lender had even seen the project.  The LOI, for example, told borrowers that it was "pleased to advise" them of "our lender's interest to provide financing."  Tr. Jan. 24, 2014 at 63:9-63:19.  But at the time the LOIs were sent, Remington had not shown the project to any lenders.  *Id.* at 65:11-65:13; Tr. Jan. 29, 2014 at 206:11-207:5.  The term sheet claimed to be "a continued expression of interest from [Remington] and a selected lender to progress into the transaction's Phase II due diligence," and promised "[p]reparation of an extensive due diligence report and site visit, [and] presentation of the due diligence report to one of the investors identified by [Remington] as having a particular appetite for this transaction," despite the fact that these lenders and investors did not exist.  Tr. Jan. 24, 2014 at 109:10-109:20, 127:24-128:11, 129:6-129:11; Tr. Jan. 29, 2014 at 211:12-213:3.  The term sheets also carefully warned that any final commitment was subject to "final approval from [Remington's] lenders and/or investors"—again, lenders and

---

[1] The Philadelphia office also originated its own projects that were never subject to term sheet fees and, often, no LOI fees were charged.  Tr. Jan. 29, 2014 at 202:9-202:21.  These projects were not the subject of the government's prosecution.

investors that did not exist.  *Id.* at 128:1-128:11; see also, Tr. Jan. 29, 2014 at 191:19-22
(Remington employee testifying that he would not contact any lenders until after completion of
Phase II due diligence.)

  In addition to the misleading language regarding phantom lenders in the LOIs and term
sheets, Remington operated the Northbridge Capital Fund ("Northbridge") to differentiate
Remington from standard brokers.  As was explained to the jury, a fund is a "committed pool of
capital" that is already "in the bank, [and] ready to use" to finance selected projects.  Tr. Feb. 6,
2014, 49:8-50:1.  Standard brokers do not have direct access to a fund to finance projects; they
merely shop projects to lenders and investors.  Tr. Jan. 24, 2014 at 87:12-87:20.  By contrast,
Remington employees were able to point to Northbridge and claim that Remington had exclusive
access to its own funds and the ability to finance projects, through Northbridge, as though
Remington was an actual lender.  *Id.* at 87:20-87:23.  For example, a Remington employee told a
borrower that he was on the investment committee for Northbridge, that the loan had been
approved, and that the borrower therefore needed to send a term sheet fee to complete the deal.
Tr. Feb. 6, 2014 at 50:19-51-9.  Remington also sent marketing letters to potential customers
claiming that "[Remington] manages, exclusively, the Northbridge Capital Fund, a $350,000,000
fund, which specializes in bridge, mezzanine[,] and distressed properties."  *Id.* at 167:25-169:18,
171:12-171:15; Gov't Ex. 2901.  And Remington falsely advertised on its website that
Northbridge had provided financing for projects it had not, including $1.8 million for a retail
property in Buckhead, Georgia, *Id.* 173:25-176:2, and $2.5 million for a real estate project in
Dayton, Ohio, *Id.* 176:179:9.  In truth, Northbridge funded a single $325,000 loan in its lifetime.
*Id.* at 166:24-167:21; Tr. Jan. 31, 2014 at 115:15-115:19.  The money for this loan was collected
from McManus and four others—McManus's business associates, friends, and family—who

ultimately lost their investment.  Tr. Jan. 31, 2014 at 117:7-117:14, 118:5-118:6.  Despite Remington's claims of Northbridge's prowess as a financing source, and its practice of holding Northbridge out as a fund from which Remington was directly able to finance projects, Northbridge never had the capability to make another loan, and, in fact, never made a second loan.

Remington's false claims that lenders and funding were available successfully misled borrowers who paid advance fees believing that funding for their project was imminent either directly through Remington and Northbridge, or through third party lenders.  One borrower testified that, in January 2007, he made inquiries to Bogdanoff to determine whether Remington "actually had the money in hand" to fund his project.  Tr. Jan. 30, 2014 at 260:13-261:25, 271:4-271:8.  Bogdanoff introduced the borrower to McManus as the "founding partner of Northbridge," and told the borrower that McManus would be "happy to assist" him.  *Id.* at 271:18-271:25.  And McManus assured the borrower that Northbridge would fund his project and that the "fee was being charged to hold the money."  *Id.* at 273:25-274:12.  From this interaction, the borrower understood that Northbridge would be "the funding source for his project" and that the funds were already available.  *Id.* at 272:21-273:1.  Another borrower testified that he surrendered $25,000 in LOI and term sheet fees believing that there were investors already interested in funding his project.  Tr. Jan. 24, 2014 at 106:14-106:22, 110:8-110:14, 117:17-117:19.

After borrowers paid the LOI and term sheet fees, believing that investors were already interested in financing their projects, Remington then directed the borrowers to change the terms of their projects in impossible ways in order to secure the financing.  One borrower, for example, having already paid $25,000 in advance fees based on the promise that investors were already

interested in financing his movie production, was ultimately told that he needed to partner with a "big movie studio" before he could get financing. Tr. Jan. 24, 2014 at 105:6-105:24, 110:8-110:14. At this point in the process, the scheme fell apart. Remington stopped responding to the borrower's communications, as the borrower learned that no financing was, in fact, imminent; that no lenders had ever been interested in his project; and that no money had ever been available or set aside to fund his project. This resulted over and over. As one borrower testified, "it suddenly seemed like a wild goose chase," a "constant wheel" of Remington employees "deflecting" his calls and requesting more and more information—often information he had previously provided. *Id.* at 116:19-117:6. And when he sent the information, he would not hear anything from Remington for "two, four, five, six, seven weeks" and follow-up emails were met with "more silence." *Id.* at 118:16-118:23.

In 2007, in what was ostensibly an attempt to separate from Remington Arizona, and its negative press, McManus founded Bluestone Real Estate Capital ("Bluestone"). While Bluestone was purportedly independent of Remington, it was housed in the same office as the prior Remington Philadelphia office, and staffed by the same employees. Tr. Feb. 6, 2014 at 42:18-43:7, 151:23-24. The government offered evidence that, despite this apparent separation, employees in the Philadelphia office, now ostensibly Bluestone employees, continued to perform work on projects from the Arizona pipeline. *Id.* at 43:18-44:8, 153:5-153:23; Tr. February 4, 2014 at 53:23-54:5. Deborah Avanesov testified that she worked for both Bluestone and Remington, simultaneously, working from the same desk and using the same computer. Tr. January 31, 2014 at 241:24-243:6. Daniel Gura testified that he simultaneously handled both Bluestone and Remington projects, and records showed that Gura accrued income from projects for both companies, simultaneously. Tr. January 29, 2014 at 218:18-219:3; Gov't Exs. 3800.

The government also offered Bluestone financial reports that included income and expenses from both Philadelphia deals (now Bluestone) and Arizona deals (Remington's Arizona pipeline). Gov't Exs. 3501A, 3501G. And Philadelphia's Remington/Bluestone employees testified that McManus knew that some of his employees, now ostensibly Bluestone employees, continued to perform work on Arizona pipeline (i.e. Remington) projects. 44:17-45:6. Andrew Benioff testified that he left Bluestone, shortly after its creation, "[b]ecause it was clear that nothing was changing, and Bluestone was turning into Remington Financial Group again." *Id.* at 52:1-52:4.

Ultimately, the Federal Bureau of Investigation ("FBI") conducted an investigation of the advance fee fraud scheme, which involved: interviews of over 50 Remington customers, approximately 35-40 Remington employees, and approximately 35-40 other people connected with the matter, Tr. Jan. 30, 2014 at 204:7-204:15; subpoenas issued to various banks and other financial institutions for Remington records, *Id.* at 204:22-204:24; and search warrants executed at Remington's offices in Scottsdale, Arizona and Englewood Colorado, in which approximately 180 items were seized, including 40-45 computers and related media items, and boxes of records, including tax returns, bank statements, and other corporate documents, *Id.* at 205:22-207:3. Through its investigation the government learned that, from at least 2005 through 2011, McManus, his partner Andrew Bogdanoff, and their employees at Remington collectively defrauded 1946 people of $26 million by collecting advance fees for financing projects, based on the promise of financing that would never come. *Id.* at 208:9-209:4, 211:16-214:1. According to Special Agent Murphy, approximately $21.5 million in advance fees collected from the Arizona office between 2006 and 2009 were deposited in Remington's Home National Bank, *Id.* at 232:16-232:23, and approximately $3.5 million in advance fees collected from the Arizona

pipeline in the Philadelphia office between 2006 and 2007 were deposited into Remington's Republic First Bank account, *Id.* at 232:24-233:6.

On April 28, 2012, a grand jury returned an indictment charging McManus with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371 (Count 1), two counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 14 and 16), three counts of money laundering in violation of 18 U.S.C. § 1957 (Counts 17-19), obstruction of justice in violation of 18 U.S.C. § 1505 (Count 32), and making false statements to the federal government in violation of 18 U.S.C. § 1001 (Count 33).  A fifteen day jury trial commenced on January 23, 2014, and the jury returned a verdict of guilty on all counts on February 19, 2014.[2]

## II. STANDARD OF REVIEW

### A. Motion for Judgment of Acquittal

A defendant may file a motion for judgment of acquittal allowing a court to set aside a jury verdict.  Fed. R. Crim. P. 29(c).  The purpose of Rule 29 is to allow the defendant to test the sufficiency of the evidence offered to support a conviction.  *See United States v. Cohen*, 301 F.3d 152, 156 (3d Cir. 2002).  However, "[a] defendant challenging the sufficiency of the evidence bears a heavy burden."  *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992). "A finding of insufficiency should be confined to cases where the prosecution's failure is clear."  *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (internal quotation marks and citations omitted).

In reviewing the record to determine whether there was sufficient evidence to support a conviction, "the court must view the evidence and the inferences logically deducible therefrom in the light most favorable to the government, to determine if there is sufficient evidence to support the factfinder's verdict."  *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989).  Moreover,

---

[2] This trial took place during the infamous polar vortex of 2014, during which the Eastern District of Pennsylvania Courthouse closed several times for snow, explaining any apparent gaps in the trial schedule.

"the trial court's ruling on the sufficiency of the evidence is governed by strict principles of deference to a jury's findings." *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984). "A verdict will be overruled only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987) (citations omitted); *see also United States v. Salmon*, 944 F2d 1106, 1113 (3d Cir. 1991) (finding that in evaluating the sufficiency of the evidence to support a conviction, the court "must determine whether a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all the elements of the offenses").

**B. Motion for a New Trial**

Rule 33 allows the court to "vacate any judgment and grant a new trial if the interest of justice so requires. " Fed. R. Crim. P. 33(a). "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2002). However, "[s]uch motions are not favored and should be granted sparingly and only in exceptional cases." *Id.* at 1005 (internal quotation marks and citations omitted). It is not enough that the court believes a verdict to be against the weight of the evidence, the court may order a new trial only if it believes that "there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* (internal quotation marks and citations omitted).

**III. DISCUSSION**

McManus argues only that there was insufficient evidence presented at trial to convict him of money laundering (Counts 17-19), making false statements to the government (Count 33),

and obstruction of justice (Count 32), and urges me to enter a judgment of acquittal pursuant to

Rule 29.  McManus argues, in the alternative, that the court should grant a new trial pursuant to

Rule 33 of the Federal Rules of Criminal Procedure.

## A. Money Laundering

McManus first argues that that the government failed to prove all of the elements of the

offense of money laundering in violation of 18 U.S.C. § 1957.  The statute provides in relevant

part:

> (a) Whoever…knowingly engages or attempts to engage in a monetary transaction in
> criminally derived property that is of a value greater than $10,000 and is derived from
> specified unlawful activity, shall be punished as provided in subsection (b).

18 U.S.C. § 1957(a).  A monetary transaction is defined in the section to mean:

> the deposit, withdrawal, transfer or exchange, in or affecting interstate or foreign
> commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this
> title) by, through, or to a financial institution (as defined in section 1956 of this title),
> including any transaction that would be a financial transaction under section
> 1956(c)(4)(B) of this title, but such term does not include any transaction necessary to
> preserve a person's right to representation as guaranteed by the sixth amendment of the
> Constitution.

18 U.S.C. § 1957(f)(1).

The government charged McManus with three counts of money laundering for: (1)

depositing a $50,000 check drawn on Remington's Republic First Bank account (Count 17); (2)

depositing a $40,000 check drawn on Remington's Republic First Bank account (Count 18); and

(3) depositing a $36,619.89 check drawn on Remington's Home National Bank account (Count

19) into his personal accounts.  McManus's only arguments are that: (1) the government failed to

prove that the monetary transaction occurred "by, through, or to a financial institution" as

defined by § 1956 of the statute; and (2) the government failed to prove that the monetary

transaction occurred "in or affecting interstate or foreign commerce." Both of McManus's arguments are unavailing.

1. Financial Institution

A financial institution, as defined in 18 U.S.C. § 1956, includes:

> (A) any financial institution, as defined in section 5312(a)(2) of title 31, United States Code…; and,

> (B) any foreign bank, as defined in section 1 of the International Banking Act of 1978 (12 U.S.C. 3101).

31 U.S.C. § 5312(a)(2) broadly provides twenty-four examples of organizations that are financial institutions under the statute, including an FDIC-insured bank, a commercial bank or trust company, a private banker, and any credit union.[3]  A commercial bank is not defined in the statute but, giving it its plain meaning, a commercial bank is "[a] bank authorized to receive both demand and time deposits, to make loans, to engage in trust services, to issue letters of credit, to rent time-deposit boxes, and to provide similar services, *Black's Law Dictionary* 172 (10th ed. 2014), or, more generally, "a bank specializing in checking accounts and short-term loans." *Webster's Unabridged Dictionary* 411 (2001).

McManus argues that the term financial institution has a "highly-technical statutory and regulatory definition,"[4] and that the government failed to prove that the monetary transaction occurred through a financial institution when it failed to introduce the Federal Deposit Insurance Commission ("FDIC") certificates for Republic First Bank and Home National Bank—the banks McManus used in the monetary transactions charged.  However, McManus points to no language

---

[3] Also included in this broad list of "financial institutions" are insurance companies, loan companies, travel agencies, casinos, dealers in precious metals, stones, or jewels, and pawnbrokers.

[4] McManus did not request that the jury instruction define a financial institution and did not object to the charge as given.  Any error not brought to the court's attention may be reviewed only for plain error.  Fed. R. Cr. Pro. 52(b); *United States v. Zomber*, 358 F.Supp.2d 442, 455 (E.D. Pa. 2005) (citing *United States v. Gambone*, 314 F.3d 163, 182 (3d Cir. 2003) ("Inasmuch as they did not object to the instructions at trial, we examine the charge for plain error.")).

in the statute, nor to any caselaw, that demands the incredibly narrow and "highly technical" definition he urges the court to adopt. As is evident from the plain language of the statute, rather than strictly limiting the definition of financial institution to FDIC-certified banks, Congress broadly defined "financial institution" in 31 U.S.C. § 5312(a)(2) to include a number of entities, including commercial banks.

At trial, the government introduced evidence from which a reasonable juror and jury could infer that Republic First Bank and Home National Bank were commercial banks and therefore financial institutions within the meaning of the statute. Witnesses testified that Remington regularly used Republic First and Home National as commercial banks, opening bank accounts at both entities, transferring money into and out of the accounts, writing checks from the accounts, and receiving statements from the banks. Tr. Jan. 31, 2014 at 223:12-223:14, 246:23-246:24, 248:5-248:22 (Deborah Ann Avanesov testified that Remington's LOI and term sheet fees from the Philadelphia office were deposited into the Republic First Bank account, and the fees from the Arizona office were deposited into the Home National Bank account); *Id.* at 245:15-245:21; Gov't Ex. 11A (Avanesov testified she kept a ledger to record the transactions on both accounts, including deposits made to, and checks drawn on, both Republic First and Home National bank accounts); *Id.* at 245:22-246:6, 259:12-259:15 (Avanesov testified she received bank statements from both accounts); Tr. Jan. 30, 2014 at 225:7-225:12 (Special Agent Murphy testified to wire transfers made both into and out of the Republic First and Home National bank accounts); Tr. Feb. 10, 2014 at 169:14-169:16 (McManus testified that Remington used Republic First Bank for its business accounts). In addition to this testimony, the government offered into evidence the ledger about which Avanesov testified showing the recordings of the deposits made to, and checks drawn on, both the Republic First Bank account and the Home National bank

account, Gov't Ex. 11A; cancelled checks drawn from both accounts, Gov't Exs. 4001B, 4002B, and 4003B; and the signature cards Bogdanoff and McManus signed to open the accounts, Gov't Exs. 5004E, 7002A.

In addition to the evidence showing Remington regularly conducted banking transactions through both Republic First Bank and Home National Bank, evidencing that the banks were commercial banks, the government also introduced evidence that, at least, Republic First Bank accepted loan applications, not related to Remington, for both small and large loans and, upon approval of the applications, made loans to customers. Tr. Jan. 31, 2014 at 135:25-136:9. Steven Shotz, a founder of Republic First Bank testified that he sat on its board until 2007 and served as chairman of the loan committee for twenty years, reviewing loan applications. *Id.* at 99:2-100:16, 101:6-101:20, 135:25-136:9.

The cumulative testimonial and documentary evidence, showing Remington using both Republic First Bank and Home National Bank as commercial banks—opening accounts, depositing and withdrawing money, transferring money between the banks, and drawing checks on the account—combined with the evidence showing that at least Republic First Bank made loans to customers, was sufficient for a reasonable juror or jury to conclude beyond a reasonable doubt that both Republic First and Home National were commercial banks and, therefore, financial institutions within the meaning of the statute. As such, McManus's depositing of checks, drawn on Remmington accounts at these commercial banks, into his personal accounts constituted "monetary transactions" as required by the statute. Accordingly, I will deny McManus's motion for judgment of acquittal as to the failure to prove that the monetary transactions alleged in the money laundering indictments occurred by, through, or to a financial institution.

2. <u>Affecting Interstate Commerce</u>

A monetary transaction requires that "the deposit, withdrawal, transfer or exchange" of funds occur "in or affecting interstate or foreign commerce."  As the court instructed the jury, the government can establish interstate commerce by showing: (1) that the monetary transaction took place in an FDIC-insured bank; (2) that the source of the funds used in the monetary transaction affected interstate commerce; or (3) that the monetary transaction involved an interstate transfer of funds.  Tr. Feb. 19, 2014 at 54:17-55:3.  To prove the transaction affected interstate commerce, the government need only demonstrate a "minimal effect, in any way or degree, on interstate commerce."  *United States v. Joyce*, No. 07-31 Erie, 2009 U.S. Dist. LEXIS 18568, at *3, *aff'd*, 373 Fed. Appx. 172 (3d Cir. 2010) (nonprecedential).  *See also United States v. Ripinsky*, 109 F.3d 1436, 1444 (9th Cir. 1997) (explaining that because financial transactions are commercial in nature, the government need only show that the transactions "had a minimal effect on interstate commerce").

McManus challenges only counts seventeen and eighteen on the interstate commerce element—the deposits of checks drawn only on Remington's Republic First Bank account in Philadelphia.  McManus argues that the government did not prove that the source of the funds used in these two monetary transactions affected interstate commerce because "nothing in the record would permit the jury to identify an interstate source for the funds."

Contrary to McManus's assertion, the government offered into evidence a general ledger from which the jury could reasonably identify multiple interstate sources for the funds.  Gov't Ex. 11A; Tr. Jan. 31, 2014 at 241:15-18.  As Avanesov testified, she kept the ledger to record sales receipts, reflecting income received from both Remington and Bluestone clients, and the deposits of those sales receipts into either Home National, the Arizona account, or Republic First

14

Bank, the Philadelphia account.  Tr. Jan. 31, 2014 at 245:17-247:3.  The ledger shows that, prior to June 5, 2007, the date McManus deposited the check drawn on the Republic First Bank account as reflected in count seventeen, deposits had been made to that account stemming from sales receipts from the following Remington customers: Vail Holiday Inn ($55,000); Le Meridian Hotel, Rosemont ($1,246,113); AEC Central Florida JEG ($50,000); Boston Heights Project ($10,000); Fort Myers Deal ($7500); Brigantine Deal ($2500); La Jolla Development ($5000); South Bass Island Resort ($12,500); Sheraton Hotel, Montgomery, AL ($15,000); Long Island Bahamas Project ($15,099); Sinaloa Pacific ($15,000); Honduras Group ($15,000); Cartersville, GA ($15,000); Meridian Idaho ($15,000); Jersey City Investments ($15,000); and Rio Grande Studios ($15,000).  Gov't Ex. 11A at 38-42, 55-57.  And prior to August 16, 2007, the date McManus deposited the check drawn on the Republic First Bank account as reflected in count eighteen, deposits were made to that account stemming from sales receipts from the following Remington customers: South Beach Vistas ($15,000); Washington DC Project ($15,000); Los Angeles Jazz Supper Club ($15,000); Las Olas of Panama ($17,000); V Strategic Group of Miami ($15,000); May Development, Inc./Park Rapids ($15,000); and Kansas Gas Lease Purchase ($15,000).  Gov't Ex. 11A at 58.  Viewing this evidence and the inferences that may be deduced therefrom in the light most favorable to the government, it was reasonable for a juror and jury to conclude that one or more of the deposits made into the Republic First Bank account were from Remington customers located outside of Pennsylvania, and that such a deposit or deposits met the "minimal effect" requirement to establish the interstate commerce element.  Accordingly, the jury could conclude that the source of the funds in the Republic First Bank account from which McManus deposited his checks for $50,000 on June 5, 2007 and $40,000 on August 16, 2007 affected interstate commerce.

Even if the notes in the ledger were insufficient, on their own, for the jury to conclude that at least some of the sales receipts deposited in the Republic First Bank account stemmed from customers located outside of Pennsylvania, the government offered additional evidence showing that the advance fees Remington deposited into its account impacted interstate commerce. Avanesov testified that "sometimes Phase 2 [term sheet] money from Arizona went to Philadelphia" and was deposited into the Republic First Bank account. Tr. Jan. 31, 2014 at 249:13-18. Avanesov, Andrew Benioff, and Daniel Gura all testified that accounts often originated in Arizona and then transferred to Philadelphia, showing that the deals themselves, from which Remington reaped the money deposited to the Republic First Bank account, impacted interstate commerce. And Special Agent Murphy testified that Remington customers were located in 48 out of 50 states—with every state impacted by the scheme, except Maine and North Dakota—and throughout several foreign countries. Tr. Jan. 30, 2014 at 217:23-218:12; Gov't Ex. 5001.

Thus, in addition to the documentary evidence showing that fees were collected from out-of-state Remington customers and directly deposited into the Philadelphia Republic First Bank account, this further testimony demonstrated that the deals themselves were conducted in interstate commerce and, therefore, the money reaped from those deals and deposited into the Republic First Bank Account had, at least, a minimal effect on interstate commerce. Accordingly, I will deny McManus's motion for judgment of acquittal as to the failure to prove that the monetary transactions occurred in or affecting interstate commerce.

In the alternative, McManus urges the court to grant a new trial on the money laundering charges. Given the mountain of evidence the government presented showing that Republic First Bank and Home National Bank were commercial banks, and therefore financial institutions

within the meaning of the statute, and that fees from projects that impacted interstate commerce were regularly deposited into the bank accounts, the fact that the government failed to produce the FDIC certificates to demonstrate that the banks were FDIC-insured is unpersuasive.  After carefully reviewing the evidence presented at trial, I have absolutely no doubt in finding that the money laundering verdicts were clearly not against the weight of the evidence, and there is no danger that a miscarriage of justice has occurred.  Accordingly, the motion for a new trial as to money laundering will be denied.

## B. False Statement

McManus next argues that the government failed to prove that he made false statements to the federal government in violation of 18 U.S.C. § 1001.

The statute provides in relevant part: "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully…makes any materially false, fictitious, or fraudulent statement or representation…shall be fined under this title, [or] imprisoned not more than 5 years…"  18 U.S.C. §1001(a)(2).  To establish a false statement violation, the government must show: (1) that the accused made a statement or representation; (2) that the statement or representation was false; (3) that the false statement was made knowingly and willfully; (4) that the statement or representation was material; and (5) that the statement or representation was made in a matter within the jurisdiction of the federal government.  *United States v. Moyer*, 674 F.3d 192, 213 (3d Cir. 2012).  Literal truth is a defense to an accusation of lying, regardless of whether the defendant believes his statement is true or false.  *United States v. Castro*, 704 F.3d 125, 139 (3d Cir. 2013).

The government charged McManus for a single count of making false statements when he told government agents "that he was only an independent contractor and never was an owner of Remington" (Count 33).  McManus challenges the second element, arguing that the government did not offer sufficient evidence to prove that his statements that "he was only an independent contractor" and that he "never was an owner of Remington" were factually false. Specifically, McManus argues that the government relied on statements made by himself and Bogdanoff regarding McManus's ownership of Remington, and did not offer any documentation to support Bogdanoff's and McManus's statements that McManus was an owner.  McManus's argument fails on two counts.  First, Bogdanoff's and McManus's statements were, on their own, sufficient for a reasonable jury to find beyond a reasonable doubt that McManus was, in fact, an owner of Remington.  Second, in addition to these statements, the government offered the very thing that McManus claims is missing—Remington's financial records showing that McManus was an owner.

The statements by McManus claiming ownership of Remington include: a sworn deposition in 2005 in which McManus stated that he and Bogdanoff owned Remington, and that he bought his shares from two prior shareholders, Tr. Feb. 11, 2014 at 109:21-110:1; 110:21-111:15; a sworn deposition in 2006 in which McManus stated that he and Bogdanoff were 50% shareholders of Remington, and that he acquired his shares in March 1996, Tr. Feb. 7, 2014 at 234:9-234:21; Feb. 11, 2014 at 117:23-118:10; another sworn deposition in 2007 in which McManus stated that he was a 50% shareholder with Bogdanoff, and that he secured his shares in 1996, Tr. Feb. 11, 2014 at 114:8-114:13, 115:3-115:5; and a financial statement submitted to First Republic Bank in which he claimed 90% ownership of Remington, Gov't Ex. 1112.

In addition to McManus's own statements, numerous witnesses also testified that they learned that McManus was a partial owner of Remington directly from Bogdanoff or McManus. Both Shane Fowler and Joel Nathanson testified that Bogdanoff had told them that McManus was his partner.  Tr. Jan. 24, 2014 at 46:11-46:25; Tr. Jan. 28, 2014 at 9:2-9:17.  Tyler Hufford testified that he too had learned that McManus was an owner of Remington in conversations with Bogdanoff in which Bogdanoff referred to McManus as his partner.  Tr. Jan. 29, 2014 at 12:14-12:22. Avanesov testified that McManus had told her that both he and Bogdanoff owned Remington.  Tr. Jan. 31 at 227:15-227:24.  Shotz testified that he knew there was a "financial arrangement" involving a profit-sharing agreement between Bogdanoff and McManus.  Tr. Jan. 31 at 104:6-104:13.  And Kristopher Wood and Andrew Benioff testified that they learned from McManus that he and Bogdanoff were partners.  Tr. Feb. 6 at 18:17-18:24; 20:20-21:1; 138:20-139:3.

McManus argues that these statements do not prove that McManus was, in fact, an owner of Remington.  The statements, according to McManus, merely show that he and Bogdanoff either mistakenly believed that McManus was an owner of Remington, or that they made the statements, falsely, for some other purpose.  However, a reasonable jury could conclude from McManus and Bogdanoff's numerous claims that McManus was a partial owner of Remington that McManus was, in fact, an owner of Remington.  The jury was free to assess McManus's credibility both with regard to the prior statements and in his trial testimony.  And a reasonable jury could have easily credited McManus's earlier statements claiming ownership of Remington, and discredited his more recent, and potentially self-serving testimony, that he was mistaken when he had previously claimed ownership of Remington.  Thus, these statements, alone, were sufficient for a reasonable jury to conclude that McManus factually owned Remington.

But, the jury did not have to rely solely on McManus and Bogdanoff's claims regarding McManus's ownership of Remington.  The government also offered into evidence Remington's corporate Annual Report & Certificate of Disclosure filed with the State of Arizona Corporation Commission for fiscal years 1998-99, 1999-2000, 2000-01, 2002-03, 2003-04, 2005-06, 2006-07, 2007-08, and 2008-09.  In each of these reports, McManus is listed as a "shareholder holding more than 20% of any class of shares issued by the corporation, or having more than a 20% beneficial interest in the corporation."  Gov't Exs. 2A-2C, 2E-2F, 2H-2K.  The government also offered Remington's corporate tax returns from 2005 to 2007, which stated that McManus was a 50% owner of Remington.  Gov't Exs. 6001, 6002, 6003.  And, finally, a letter dated October 13, 2008 from Mark Haltzman, a Remington lawyer, to Hank Abrams, a Remington accountant, in which Haltzman stated that McManus ceased to have any ownership interest in Remington as of January 1, 2007.  Gov't Ex. 87.

Moreover, the government provided evidence showing that McManus was a W-2 employee thereby proving that his statement that he was only an independent contractor was also false.  The government offered into evidence McManus's W-2 Wage and Tax Statements from Remington showing that McManus was an employee of Remington and received an annual salary with Federal Income, Social Security, and Medicare taxes all withheld from at least 2005 to 2008.  Gov't Exs. 6021-24.  Remington's accountant testified that McManus was a W-2 employee.  Remington employee Shayne Fowler, who worked in the Arizona office and assisted with payroll for the Philadelphia office, testified that McManus was a W-2 employee from at least 2003 through the middle of 2008.  Tr. Jan. 24, 2014 at 47:9-10, 50:21-24.  And Remington employees testified that McManus "ran the company," Tr. Jan. 24, 2014 at 50:8-9; Tr. Feb. 6, 2014 at 138:14; see also, 20:18-19, and that McManus was the "boss," Tr. Feb. 6 at 138:9.

This cumulative evidence was more than sufficient for a reasonable jury to conclude that McManus was in fact both an employee and an owner of Remington, and therefore made a false statement to investigators when he claimed he was only an independent contractor and denied that he was an owner.  Accordingly, the motion for judgment of acquittal on the false statements conviction will be denied.

In the alternative, McManus urges the court to grant a new trial on the false statement charge arguing that the court should "acknowledge the import" of the defense evidence showing that Remington's lawyer belatedly told McManus that Remington had never issued shares to McManus or Bogdanoff by signing the actual share certificates.  I am not persuaded that this technical argument overcomes the mountain of evidence that the government offered showing how McManus both ran Remington's Philadelphia office and reaped the benefits of the business. Regardless of whether Remington formally issued the shares, on paper, the evidence persuasively showed that McManus operated as a Remington owner and employee, in fact.  After carefully reviewing the evidence presented at trial, I easily find that the false statement verdict was clearly not against the weight of the evidence, and there is no danger that a miscarriage of justice has occurred.  Accordingly, the motion for a new trial as to the false statement will be denied.

**C. Obstruction of Justice**

Finally, McManus argues that the government failed to prove that he was guilty of obstruction of justice in violation of 18 U.S.C. § 1505.

The statute provides in relevant part that "[w]hoever corruptly, or by threats of force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any

pending proceeding is being had before any department or agency of the United States" may be fined and imprisoned for up to five years.  To establish a violation 18 U.S.C. § 1505, the government must show that: (1) a proceeding was pending before a United States agency; (2) the defendant knew a proceeding was pending; and (3) the defendant intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding.  McManus does not challenge the government's evidence as to any of these elements.

The government charged McManus with a single count of obstruction of justice for emailing a document, three days after the FBI and IRS searched Remington's offices in Arizona and Colorado, entitled "Bluestone FAQ – Response to Questions re RFG" ("Bluestone FAQ")[5], to potential witnesses, alleging that the document "contain[ed] false information about defendant MCMANUS' role in Remington Financial Group" (Count 32).  McManus argues only that the indictment imputes a falsity requirement as an element of the crime because it specifically charges McManus with obstruction by providing "false information" to potential witnesses. McManus points to no cases that support this proposition, and I could find none.  Moreover, as the Third Circuit has explained, "[i]t is a long-standing principle of criminal procedure that a part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a useless averment that may be ignored."  *United States v. Coyle*, 63 F.3d 1239, 1248 (3d Cir. 1995) (quoting *United States v. Miller*, 471 U.S. 130, 136 (1985) (internal quotations omitted).  The indictment's language regarding the "false information" in the

---

[5] The Bluestone FAQ contained six separate questions and answers, including:
> Are Bluestone and Remington Financial Group the same company?
>> No.  Bluestone Real Estate Capital and Remington Financial Group/Remington Capital are two completely separate companies and never were the same.
> How is Matthew McManus affiliated to [Remington]?
>> Matthew McManus is a former Remington of PA independent contractor.  McManus left Remington in 2006 with other Remington of PA producers to launch Bluestone Real Estate Capital, a real estate investment banking firm that focuses on securing financing for the nation's top-tier real estate companies.

Bluestone FAQ is a mere "useless averment" that does not, on its own, create an additional essential element of falsity in an obstruction of justice charge.  Finally, McManus did not request a jury instruction that included falsity as an essential element of the crime,[6] and I did not instruct the jury that it was required to find that the Bluestone FAQ contained false statements. Accordingly, falsity was not an essential element of the obstruction of justice charge and the government was not required to prove falsity.

However, even if falsity were an essential element of the crime charged, the government offered evidence sufficient for a reasonable jury to find beyond a reasonable doubt that the Bluestone FAQ contained false information.  First, the government offered evidence sufficient to prove that the statement in the Bluestone FAQ that Remington and Bluestone were "two completely separate companies and never were the same" was false.  For example, Avanesov and Benioff both testified that when Bluestone formed in the Philadelphia office, employees at the now Bluestone office, including Andrew McManus and Gura, continued to work on Remington deals.  Tr. February 4, 2014 at 53:23-54:5 (Avanesov's testimony); Tr. Feb. 6, 2014 at 43:18-44:8 (Benioff's testimony). Avanesov also testified that she was an employee of both Bluestone and Remington, simultaneously, and worked from the same desk, using the same computer, while doing work for both.  Tr. January 31, 2014 at 241:24-243:6.  And Gura testified that he too simultaneously handled both Bluestone and Remington accounts, working from the same desk and using the same equipment.  Tr. January 29, 2014 at 218:18-219:3.  Furthermore, financial reports titled "BlueStone Real Estate Capital" and subtitled "Profit & Loss by Class" included income and expenses from both Philadelphia (i.e. Bluestone) and Arizona (i.e. Remington) accounts.  Gov't Exs. 3501A, 3501G.  Finally, a "BlueStone Real Estate Capital" financial report

---

[6] Any error not objected to at trial may be reviewed only for plain error.  Fed. R. Cr. Pro. 52(b); *Gambone*, 314 F.3d at 182.

subtitled "Sales by Rep Summary January 1 through November 14, 2007" lists "Dan Gura" as accruing income from both Arizona (Remington) and Philadelphia (Bluestone) accounts. Gov't Exs. 3800.

The government also offered evidence sufficient to prove that the statement in the Bluestone FAQ that McManus was a former Remington independent contractor was also false. As discussed above, McManus's own statements; the testimony of numerous witnesses; Remington's annual disclosure reports filed with Arizona's Corporations Commission; Remington's tax returns; McManus's W-2 statements; and a letter penned by Remington's attorney, Mark Haltzman, demonstrated that, rather than working as an independent contractor, McManus was both a co-owner and a W-2 employee of Remington.

Therefore, while an obstruction of justice conviction does not require the government to prove that statements in the Bluestone FAQ were factually false, the government nonetheless proved the falsity of more than one statement. And McManus does not challenge any of the required elements for the obstruction of justice conviction. Accordingly, the motion for judgment of acquittal on the obstruction of justice conviction will be denied.

In the alternative, McManus urges the court to grant a new trial on the obstruction of justice charge. Again, McManus argues that the statement in the "Bluestone FAQ" that he was not an owner was precipitated by his attorney's statement that Remington had never formally issued shares to McManus. As discussed above, I am not persuaded by McManus's argument that the obstruction of justice charge requires the government to prove that the Bluestone FAQ included false statements. Thus, even if the statement by McManus's attorney gave McManus an excuse to make the false statement regarding his role as an independent contractor in the Bluestone FAQ, it does not impact the verdict. Even if I were persuaded that the obstruction of

justice charge requires the government to prove that the Bluestone FAQ included false statements, I am not persuaded that Remington's failure to officially transfer shares to McManus impacts the question of whether McManus was, in fact, an owner of Remington.  The evidence shows that McManus ran the business from the Philadelphia office and shared in the LOI and term sheet fees reaped from the scheme.  Given this evidence of ownership with Bogdanoff, McManus cannot now hold-up a single email from his attorney stating that he had never officially been transferred shares as evidence that he was never an owner, and therefore did not lie when he claimed as much.  Finally, even if I were persuaded that McManus had a genuine belief at the time he sent out the Bluestone FAQ that he was not and had never been an owner of Remington, which I am not, the FAQ also falsely states that Remington and Bluestone were "two completely separate companies and never were the same" and that McManus was an "independent contractor" when he was at the very least a W-2 employee.  Accordingly, the motion for new trial as to obstruction of justice will be denied.

## IV. CONCLUSION

For the foregoing reason, I will deny McManus's motion for judgment of acquittal and motion for new trial.  An appropriate order will follow.