# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

    v.                     :          CRIMINAL NO.  12-190

MATTHEW McMANUS          :

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and David L. Axelrod, Assistant U.S. Attorney for the district, hereby submits this memorandum and respectfully asks the Court to sentence defendant to a sentence of 220 months' imprisonment.   Additionally, the government respectfully requests that the Court order McManus to make a large upfront lump sum payment towards restitution.

From at least 2005 until 2009, defendant Matthew McManus got rich by taking advantage of the entrepreneurs and the dreamers who were duped into believing McManus' company, Remington Financial Group, could help them realize their dreams.   McManus did not steal directly from all of the approximately 1,900 victims of this scheme, but instead was integral in constructing the machine that took their money and dashed their hopes.

McManus has shown no sign of remorse.   Indeed, since this criminal investigation became overt, McManus has attempted to distance himself from the scheme by obstructing justice, lying to federal agents, and perjuring himself on the witness stand.   He has earned every day of the substantial sentence recommended by the government.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The indictment charged McManus with committing the following offenses: one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 371; three counts of wire fraud, in violation of 18 U.S.C. § 1343, three counts of money laundering, in violation of 18 U.S.C. § 1957, one count of obstruction of justice, in violation of 18 U.S.C. § 1505, and one count of making false statements to law enforcement, in violation of 18 U.S.C. § 1001.

Prior to trial the government moved to dismiss one of the wire fraud counts. After a month-long trial the jury found McManus guilty of every other count.

### A. Defendant's Criminal Conduct

The evidence introduced at trial showed that until McManus separated from Remington at the end of 2008, he was the co-owner and co-operator of Remington Financial Group ("Remington"), a company that fraudulently induced hundreds of people searching for financing for business projects to pay Remington fees in excess of $10,000 each, by falsely claiming that Remington or its "investor" or "lender" was interested in providing financing for the customer's project.

In 1993 Bogdanoff started Remington in Philadelphia and incorporated the company in Pennsylvania, offering customers' assistance in securing loans for commercial projects. Later, Bogdanoff hired Matthew McManus who became his partner and co-owner in the business. In approximately 1997, Bogdanoff moved to Arizona and incorporated the business there. From 1997 until 2008, Bogdanoff ran Remington's Arizona branch and McManus ran Remington's Philadelphia branch. Though Remington was one company until 2008, there were two somewhat distinct components: Remington's Arizona office run by Bogdanoff, and Remington's Philadelphia office run by McManus. Most of the fraud originated out of the

2

Arizona office, but as was demonstrated at trial: the Philadelphia office ran by McManus engaged in the same deceptive tactics; the Philadelphia office was responsible for helping perpetuate the Arizona fraud; McManus was the architect of one of the biggest lies Remington used to commit this massive fraud, and McManus reaped his share of the fraud profits.

### 1. Remington's Letter of Interest

The fraud was premised on employees in Remington's Arizona office selling Remington's Letter of Interest ("LOI") to customers looking for funding for their business venture. The LOI language has slightly changed over the years, but generally has an opening paragraph that read:

> [customer] has submitted a request for financing in the principal minimum amount of [XXXXX]. Based on our initial due-diligence and review of information provided to Remington, Remington is pleased to advise you or our acceptance of the application and **our lender's interest** to provide financing as more particularly described hereunder.

The LOI goes on to state the terms of the financing Remington's lender can provide. The LOI required the customer to pay a fee ranging from $5,000 up to $25,000 for Remington's services in securing this financing.

The LOI was entirely fraudulent. The LOI was written specifically to lead the customer to believe that Remington already had someone interested in financing their project and that financing was be forthcoming after the customer paid Remington's fee. This was not true. After the Remington sales person, called an account executive, had basic information about the project they would either decide themselves what loan terms to include in the LOI or they would ask defendants Bogdanoff or Fowler, who would supply the terms for the LOI. No one at Remington consulted with any lenders or investors, and the terms supplied in the LOI were completely unrealistic. They were meant solely to induce the customer to pay Remington's fee.

3

## 2.    Remington's Term Sheet

Until late 2008, the defendants used this fraud scheme to induce customers to pay a second advance fee, in addition to the initial LOI fee.   Shortly after the customer paid Remington's LOI fee, Remington's Philadelphia office run by McManus would conduct due diligence on the customer's project.   During this due diligence period, Remington would ask the customer to provide numerous documents and information about their specific project.   Once the customer completed this first due diligence period, Remington's Philadelphia office would send the customer who already paid the LOI fee a document called a "Term Sheet."

The defendants used the Term Sheet, like the LOI, to induce customers to believe that upon payment of this fee, Remington's financing would be forthcoming.   As with the LOI, Remington wrote the Term Sheet very carefully to convey to the customer/victim that the issuance of a Term Sheet did not guarantee financing for the project.   However, it left the customer with the unmistakable impression that Remington was able to provide the financing imminently once the payment was made.   Every Term Sheet issued contained a clause indicating that the loan would close within a limited number of days.

Like the LOI, the Term Sheet was meaningless.   It was simply a vehicle to steal more money from victims.   At the time the Term Sheet was issued Remington had spoken to no lending sources, and Remington's employees knew that it would be difficult, if not impossible, to find financing for the project.

In June 2008, the Wall Street Journal published an article questioning whether Remington was a fraud.   After the publication of this article McManus attempted to distance himself from Remington in various ways.   He lied to Remington's accountants by telling them

that he had relinquished his ownership in Remington at the beginning of 2007 and he deleted his Remington email account.

### 3.     The Other Lies Used to Sell the LOI and Term Sheet.

The defendants and the Remington employees who sold the LOI and Term Sheet used a variety of other lies and misrepresentations to further the fraud scheme.  Remington used various incarnations of its website to propagate the myth that Remington was a legitimate and successful company.  On its website Remington provided vague details about projects that it "recently" secured funding for, such as: "Remington secures $5.8 Million construction to permanent financing for 103 unit apartment complex, Washington, DC."  The primary problem with these representations is that Remington's Arizona pipeline (as this scheme was called by Remington insiders) had no success funding projects.  At trial the government showed that from 2005 to 2011, over 1,900 victims paid Remington's Arizona office advance fees to secure financing.  Remington secured funding for one project.  Remington's "success" rate was less than one tenth of one percent.

Remington's account executives told customers an assortment of lies to further induce the customer to pay the LOI and Term Sheet fee.  These lies and misrepresentations included: (1) Remington was the lender or the investor; (2) Remington had a dedicated lending source, Northbridge; (3) Remington had five lending sources that were interested in the customer's project; (4) Remington's lender had pre-approved the customer's project; (5) Remington secured financing for 80% of its deals; and (6) if the customer did not pay Remington's fee, the investor was going to pull back the proposed funding.  All of these lies were meant to make the customer believe that if they paid Remington's fees, funding was almost certain.

### 4.    McManus' Role in the Remington Scheme

While most of Remington's fraudulent LOI were sold by Remington employees located in Arizona, the Philadelphia office also engaged in the same type of fraud.   Indeed, McManus had a longstanding relationship with a New Jersey-based firm called Kilpatrick and Hart.   Since at least 2005, Kilpatrick and Hart referred victims to Remington's Philadelphia office, who issued Remington's LOI to these victims.   As with the deals originated through the Arizona office, these victims were led to believe that Remington was the "lender" or that Remington had someone ready to provide financing for their project.   This was not true. However, to induce Kilpatrick and Hart to continue to send these clients to Remington, McManus had Remington pay Kilpatrick and Hart a portion of the LOI fee it received.   As with the "Arizona pipeline," Remington did not expect to find financing for the Kilpatrick and Hart deals originated by the Philadelphia office.   Rather, these deals were originated solely to collect advance fees.

McManus was also the architect of the Northbridge lie.   At trial the government showed that Northbridge was a company owned in part by defendant Matthew McManus.   In or about 2004, Northbridge made a $325,000 loan to a local real estate developer.   The loan was funded directly by McManus and a number of other people.   However, this loan went bad in 2005 with Northbridge filing a lawsuit to attempt to recover its investment.   Besides this initial project Northbridge had no other funds and made no other loans.

Despite these facts, McManus used Northbridge as a tool to induce victims to pay Remington advance fees.   McManus directed his employees to tell potential customers that Northbridge was a $350 million fund.   McManus publicized it on Remington's website as a fund able to finance projects needing $2 million to $15 million.   McManus issued false press releases stating that Remington had used Northbridge to fund deals that Northbridge had nothing to do

6

with.  And McManus issued a commitment letter to a Remington victim stating that Northbridge was ready to deliver $46 million in funding if the victim paid Remington an up-front fee of $469,000.

### B.    Protecting the Lie through the Due Diligence Process.

Remington induced more than 1,900 victims to pay the advance fees.  Having victimized so many people the defendants needed a way to minimize the risk of criminal charges or civil lawsuits.  The defendants used the due diligence process to do just this.

After a customer paid Remington's fee, Remington employees told customers that they needed to provide personal information and further information about their project so Remington could conduct due diligence.  However, Bogdanoff and McManus instructed the Remington employees to use the supposed due diligence inquiry to find problems with the projects so that Remington could find an excuse for why the project did not receive financing.  This way Remington could blame its failure to fund the victim's loan on the victim himself or herself.  To accomplish this goal Remington employees conducting supposed due diligence inquiries were instructed to: (1) ask customers to provide documents that Remington knew the customer could not produce; (2) ask customers to change the project in ways it knew were unacceptable to the customer; and (3) tell customers that the terms of financing in Remington's LOI needed to be dramatically changed in ways it knew were not economically feasible.  Bogdanoff and McManus used the due diligence process to frustrate customers and cause them to eventually give up and walk away from the advance fees already paid to Remington.

### C.    McManus' Money Laundering

From in or about 2005 to in or about 2009, Remington victims whose projects were originated by the Arizona office were directed to pay the LOI fee by wire or check, usually wire, to

Remington's main Arizona bank account at Home National Bank (account ending in 9201). From in or about March to November 2007, Remington victims who paid the term sheet fee were directed to send this payment, by check or wire, to Remington's main Philadelphia bank account at Republic First Bank (account ending in 9205). As charged in the indictment, McManus engaged in the following three monetary transactions using funds from these two accounts:

1. On or about June 5, 2007, McManus deposited a check for $50,000, written by Bogdanoff, in to his Citizen's Bank checking account (ending in 5596), drawn on Remington's Republic First account (ending in 9205).

2. On or about August 16, 2007, McManus deposited a check for $40,000, written by Bogdanoff, in to his Citizen's Bank checking account (ending in 5596), drawn on Remington's Republic First account (ending in 9205).

3. On or about January 21, 2008, McManus deposited three checks totaling $36,619.89, written by Bogdanoff, in to his Citizen's Bank checking account (ending in 5596), drawn on Remington's Home National Bank account (ending in 9201).

## D. McManus' Attempt to Distance Himself from Remington While Still sharing it its Profits.

In 2006, Remington employees such as Kris Wood and Andrew Benioff, who were not involved in the fraud, began pushing McManus to end his association with Bogdanoff and the Arizona office. At the end of 2006 McManus incorporated Bluestone, and told these employees that Bluestone was a separate company. Bluestone was "launched" by McManus on March 1, 2007, and despite having a separate name, worked with Remington as essentially one company until late 2008. During this time, Remington and Bluestone shared expenses, office space, and

8

personnel, and Bogdanoff and McManus shared in the profits generated by the two companies. Indeed, McManus had a Remington employee prepare a monthly reconciliation to help ensure that McManus received his cut of the Arizona fraud proceeds. McManus even went so far as to open a new Remington bank account in August 2007 that he had sole control of to make sure he received his share.

On June 25, 2008, the Wall Street Journal published an article stating that Remington was being investigated by the FBI. McManus immediately deleted his Remington email account to destroy evidence of his connection to the company. Later in the year he lied to Remington's accountants in an attempt to make it appear that he separated from Remington when Bluestone was formed years earlier. This was not true. Until the end of 2008 McManus continued to receive a share of the Arizona fraud proceeds.

Sometime around the beginning of 2009, Bluestone and Remington ceased to be affiliated and stopped sharing expenses and revenue.

### E.    The Investigation by the FBI and IRS

On March 15, 2011, agents from the FBI and IRS executed search warrants at Remington's offices located in Arizona and Colorado. During the execution of these warrants, law enforcement seized substantial amount of business records and computers. A number of the computers were then searched and analyzed by FBI computer forensic examiners. Both hard copy records seized from Remington's offices and electronic records discovered on Remington's computers will be used at trial.

Word of law enforcement's investigation at Remington's offices spread quickly. At Bluestone Real Estate Capital ("Bluestone"), employees including defendant Matthew McManus heard about the searches almost immediately. Only three days later on March 18,

2011, McManus sent an unsolicited email to three Bluestone employees titled "Confidential."

This email contained an attachment titled "Bluestone FAQ - Responses to Questions re RFG.doc."

The attached document contained the following misrepresentations about McManus' role in

Remington:

> **Are Bluestone and Remington Financial Group the same company?** No. Bluestone
> Real Estate Capital and Remington Financial Group/Remington Capital are two
> completely separate companies and never were the same.
>
> **What is the Relationship between the companies?**
>
> There is no relationship between the two firms. The confusion in the market place stems
> from the existence of Remington Financial Group, Inc., a Pennsylvania company and
> Remington Financial Group of Arizona. When RFG of Arizona began to grow, so did the
> confusion. Therefore, the principal and executives of Remington of PA left Remington of
> PA and formed Bluestone Real Estate Capital to denote its distinction from RFG Arizona
> and from the RFG name altogether. Bluestone's focus is on the institutional caliber client.
> As far as Bluestone knows, Remington of PA ceased its existence when Bluestone was
> formed.
>
> \*\*\*
>
> **How is Matthew McManus affiliated to RFG?** Matthew McManus is a former
> Remington of PA independent contractor. McManus left Remington in 2006 with other
> Remington of PA producers to launch Bluestone Real Estate Capital, a real estate
> investment banking firm that focuses on securing financing for the nation's top-tier real
> estate companies.

Clearly, McManus hoped that these misrepresentations would be repeated to law enforcement and

McManus could distance himself from the Remington fraud he benefitted from so much.

This email was McManus' first attempt to mislead law enforcement. Only days

later, on March 22, 2011, two FBI agents visited McManus at his Philadelphia office. McManus

voluntarily agreed to speak to the agents and during this interview said that he was an independent

contractor for Remington and was never a "W-2" employee. However, this was a lie. McManus

was an owner and a Remington W-2 employee. This was not the only lie McManus told the

agents. McManus also used the following lies: (1) Bluestone was never a part of, or affiliated with, Remington; (2) after Bluestone was formed, Remington of Pennsylvania ceased to operate; and (3) any payments that were made between Remington and Bluestone were referral fees.

On July 26, 2011, the same FBI agents visited McManus at his Philadelphia office to ask him additional questions. During this second interview, McManus lied again, and told the agents that he was a Remington "independent contractor" and never owned any part of Remington. This lie is flatly contradicted by tax documents filed with the IRS by Remington and McManus, and other documents.

### F.     McManus Continued to Lie About his Involvement in Remington.

Later in 2011, McManus was negotiating to sell Bluestone and work for another firm. As part of this negotiation process he executed an employment application where he falsely stated that he has worked for "self/Bluestone" since 1993. McManus purposefully omitted any reference to Remington on this application. However, the firm learned about McManus' connection to Remington and inquired about his status as an officer of Remington, his ownership of Remington, and the existence of fee sharing agreements with Remington. On September 19, 2011 McManus had his attorney, Mark Haltzman, send an email to the firm fraudulently stating that "I spoke with Matthew McManus . . . and he indicated to me that at no time . . . was [McManus] ever [a] shareholder/officer/director of Remington." Subsequently, during an in-person meeting in Philadelphia, McManus repeated these lies.

### F.     McManus Lied at Trial.

McManus testified at trial for more than a day. During this testimony McManus lied about numerous things. Most importantly McManus continued to lie to distance himself

11

from ownership of Remington.[1]  He first testified that he did not know who he acquired shares of stock from to become an owner of that company.  Tr. Feb. 11, 2014 at 105.  Then McManus testified that he actually became an owner of the company by paying money to a broker who worked with Remington.  *Id.* at 107.  Then when confronted with his deposition testimony from earlier civil lawsuits, McManus changed his story again, and admitted, begrudgingly, that Bogdanoff gave him fifty percent of Remington in 1996.  *Id.* at 116.

## II.   SENTENCING GUIDELINES

### A.   Statutory Maximum Penalties.

The Court may impose the following statutory maximum sentences:

1.   Count One (conspiracy to commit mail and wire fraud), five years imprisonment, three years supervised release, a $250,000 fine, and a $100 special assessment;

2.   Counts Four and Six (wire fraud), 20 years imprisonment, three years supervised release, a $250,000 fine, and a $100 special assessment;

3.   Counts Seventeen, Eighteen, and Nineteen (money laundering), 10 years imprisonment, three years supervised release, a $250,000 fine, and a $100 special assessment;

4.   Count Thirty-Two (obstruction of justice), five years imprisonment, three

---

[1] During the trial the government introduced GX 1112 (attached as Ex. 1), a personal financial statement McManus completed in the process of obtaining a loan from Republic First Bank in May 2006.  On that statement McManus represented to the bank that he owned 90 percent of Remington Financial Group.  McManus testified that he did not actually own 90 percent of Remington, he just wrote that he owned 90 percent of the company because that was a more accurate representation of the amount of the profits of the company he was entitled to.  Tr. Feb. 11, 2014 at 139.  This is just one example of the steps McManus was willing to take to distort and obfuscate facts before the jury.

years supervised release, a $250,000 fine, and a $100 special assessment; and

5.     Count Thirty-Three (false statement to the federal government), five years imprisonment, three years supervised release, a $250,000 fine, and a $100 special assessment.

The total maximum sentence is: 85 years imprisonment, three years supervised release, $2,250,000 fine, and an $800 special assessment.

**B.     Sentencing Guidelines Calculation.**

The government agrees with the sentencing guidelines calculation in the Presentencing Report prepared by the United States Probation Office.   PSR ¶¶ 36-50.   The following charts reflect this calculation:

## CALCULATION OF THE BASE OFFENSE LEVEL

| Base offense level (money laundering) | U.S.S.G. § 2S1.1(a)(1) | 35 |
|---|---|---|
| Base fraud level | U.S.S.G. §2B1.1(a)(1) | (7) |
| Loss amount greater than $7,000,000 but less than $20,000,000 | U.S.S.G. §2B1.1(b)(1)(K) | (+20) |
| More than 250 victims | U.S.S.G. §2B1.1(b)(2)(C) | (+6) |
| Sophisticated Means | U.S.S.G. §2B1.1(b)(10)(C) | (+2) |

## CALCULATION OF TOTAL OFFENSE LEVEL

| Base offense level (money laundering) | U.S.S.G. § 2S1.1(a)(1) | 35 |
|---|---|---|
| Money laundering | U.S.S.G. §2S1.1(b)(2)(A) | +1 |
| Leadership enhancement | U.S.S.G. §3B1.1(a) | +4 |
| Obstruction of justice enhancement | U.S.S.G. § 3C1.1 | +2 |
| Total adjusted offense level | | 42 |

The defendant is in criminal history category I, which makes the advisory guideline

range 360 months to life imprisonment. Because of the statutory maximum sentence, the actual range is 360 to 1,020 months' imprisonment.

## C.     The Parties' Sentencing Agreement.

The parties have reached a comprehensive sentencing agreement that is attached as exhibit 2 to this memorandum. For purposes of the sentencing hearing the relevant terms of this agreement are: (1) the parties agree that as properly calculated under the United States Sentencing Guidelines, the advisory guideline range of imprisonment is 360 to 1,020 months' imprisonment; (2) the parties recommend that the Court impose a sentence within the range of 120 to 220 months' imprisonment; and (3) the parties are free to ask the Court to impose any sentence within this range.

## IV.     ANALYSIS OF 3553(a) FACTORS

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) indicates that the most appropriate sentence is a sentence of 220 months' imprisonment. The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing

14

Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The defendant's conduct in this case is especially serious. McManus and his co-conspirators concocted an elaborate fraud to steal more than $26 million from approximately 1,900 people. McManus lied, cheated, and stole from unsuspecting people hoping Remington would help them achieve their dreams.[2]

The victims of Remington's scheme were not high-wealth individuals. Rather, the typical Remington victim was a small business or an entrepreneur looking for financing. The victims were susceptible to the scheme because they were not large businesses, or wealthy individuals, who could successfully secure financing from banks. The victims were by and large dreamers who McManus and his co-conspirators preyed on for their own benefit.

McManus was driven purely by greed and no amount of money was enough for him. Despite making substantial amounts of money from legitimate work, McManus continued to engage in the fraud scheme.

McManus is clearly an intelligent but extremely manipulative individual. He grew up in a family where he had resources that allowed him access to higher education and as is apparent from the PSR, had a supportive and loving family. PSR ¶¶ 58-63. Instead of becoming a productive member of society, defendant instead sought to make easy money through years of

---

[2] The indictment alleged that the Remington scheme began in 2005. However, Tyler Hufford's testimony proved McManus likely started using the tactics described in the indictment much earlier. Indeed, McManus was sued for similar fraudulent conduct occurring in 2000. *See* Victim Statement of Vinay Karna, attached as Ex. 3.

lying.

It does not appear that McManus' cut-throat and immoral business practices were limited to his actions related to Remington.[3]  Garret Wyman was a Remington employee and McManus' friend.  In 2004, Wyman's mother invested $50,000 with McManus' company Northbridge Capital, who used this money to make a $325,000 loan.  This loan was never repaid and Northbridge ceased to operate thereafter.

In 2006, Wyman was in the last stages of a losing battle with cancer, and attempted to contact McManus to discuss his mother's investment.  McManus refused to return Wyman's calls and Wyman died shortly thereafter.  Wyman's sister has written a letter describing McManus' conduct during this period.  *See* Stacey Wyman Letter of March 4, 2014, attached as Ex. 4.

At the end of 2008 McManus actually split from Bogdanoff and Remington, but his use of deceptive business tactics did not end.  McManus ran Bluestone using the same tactics used by Remington.  Bluestone solicited large advance fees based on false statements about access to financing sources and then referred its unsuspecting clients to other fraudsters.

For instance, in 2009 Bluestone approached a company named Shamin Hotels about investing in a portfolio of hotels, with a man named Robert E. McDonald.  Bluestone vouched for McDonald who turned out to be a fraudster who had already once been convicted of fraud in federal court.  Shamin Hotels invested approximately $1.5 million into another fraud scheme.  Shortly thereafter McDonald was indicted for this fraud and later found guilty after trial in the Southern District of New York.  Shamin Hotels filed suit against Bluestone for its

---

[3] The list of lawsuits and judgments against McManus is telling.  PSR ¶ 83.  He has been sued based on allegations of sexual harassment and numerous claims of fraud.

involvement in this fraud. *See Shamin Hotels, Inc. v. NAI Bluestone Real Estate Capital*, attached as Ex. 5. Bluestone failed to defend the lawsuit and in June 2012 a default judgment was entered against Bluestone.[4]

In 2010 a company called West Chester Host paid Bluestone $45,000 to secure financing for hotel acquisitions. West Chester, like the Remington victims, sought financing for hotel acquisition/construction. Bluestone told West Chester that for a fee it could arrange this financing. After, taking $45,000 in advance fees, Bluestone recommended that West Chester obtain financing from a company called Alliance Development Fund, Inc. Alliance told West Chester that it would provide $15,000,000 in financing upon West Chester wiring $750,000 to a "Capital Contribution" fund. West Chester wired the money and Alliance disappeared with the $750,000. *See West Chester Host v. Bluestone Real Estate Capital, et al.*, attached as Ex. 7. Bluestone did absolutely no due diligence and simply referred West Chester to another advance fee fraud scheme. Bluestone was sued and failed to defend the lawsuit and in May 2014 the court entered a default judgment against Bluestone.

McManus does not appear to have any regret or remorse for the actions he has taken in his life. His victims are countless,[5] and he has failed to take any steps to help fix the harm he has caused so many by his greed and blatant disregard for the law.

---

[4] In the wake of the Shamin lawsuit, the Commonwealth of Virginia discovered that Bluestone had violated state law by acting as an unlicensed broker-dealer and "obtaining money . . . by means of an[] untrue statement of a material fact . . . ." To conclude the investigation with Virginia, McManus and Bluestone entered into a settlement whereby McManus agreed to pay a monetary penalty and refrain from violating Virginia law again. *See Settlement Order, Commonwealth of Virginia v. NAI Bluestone Real Estate Capital,* attached as Ex. 6.

[5] As the trial testimony showed, McManus also lied to Marcus and Millichap to secure a $560,000 loan that he failed to pay back.

**B.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect For the Law, and to Provide Just Punishment for the . Offense.**

The Remington advance fee fraud scheme was not unique.   Unfortunately, the world of commercial financing is filled with people engaging in this type of criminal activity.   A simple search on the internet will return information on dozens of companies like Remington, Arlington Richfield, and others which profess the ability to supply millions of dollars in weeks, in exchange for an advance fee.

However, what was unusual about the Remington fraud was its longevity and breadth.   McManus was one of the drivers of this success.   A sentence of 220 months' imprisonment will provide just punishment and represent a proportionate sentence for the massive harm McManus caused.

**C.      The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant.**

For the reasons stated above, a sentence within the advisory guideline range is necessary to afford both specific and general deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

For years McManus profited from these crimes and yet denies any wrongdoing. Instead of admitting his crimes, McManus lied to the FBI, attempted to obstruct justice, and then lied to the jury to save himself.   Additionally, McManus and his employees engaged in the exact same fraudulent business practices when running Bluestone after he split from Remington.   There is nothing that suggests that McManus can be quickly rehabilitated.   Rather it appears that McManus is completely unwilling to accept reality and take responsibility for his actions.   The public needs to be protected from McManus.

General deterrence is also very important in this case. In the wake of the 2008 financial downturn there has been an explosion of fraud schemes preying on people who seeking mortgages or other types of financing. A sentence of 220 months' imprisonment will send a strong message to those engaged in similar schemes and hopefully will serve to deter others who might think about engaging in this type of criminal conduct.

**D. The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.**

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D). McManus grew up in privilege and had significant opportunities to live a law-abiding life.

**E. The Guidelines and Policy Statements Issued by the Sentencing Commission and the Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

All of the relevant facts suggest the Court should impose a sentence of imprisonment similar to the sentence Bogdanoff received. McManus deserves the same sentence as Bogdanoff for the following reasons. First, Bogdanoff and McManus were co-leaders of the scheme and shared the profits from the scheme. Second, unlike Bogdanoff, McManus actively tried to frustrate this criminal investigation. As described above, to frustrate the investigation and prosecution of this case McManus lied to agents, attempted to convince witnesses to lie to the government, and perjured himself during trial. Third, unlike Bogdanoff, McManus has not accepted any responsibility for his actions.

When all the facts are considered it is clear that McManus is as culpable as Bogdanoff, poses an equal danger to the community as Bogdanoff, and should be punished

similarly.

## V.    RESTITUTION

The government respectfully asks the Court to order McManus to pay full restitution of $17,774,174 to the victims of his fraud scheme. Using files seized from Remington's Arizona office, the government created a list of victims who were fraudulently induced to pay Remington advance fees from 2005 to March 2011. This analysis shows that from 2005 to 2008 Remington defrauded approximately 1,310 people out of $17,774,174.

## VI.    SENTENCING RECOMMENDATION

Based on all of the foregoing, the government requests that the Court: (1) impose a sentence of 220 months' imprisonment; (2) impose a term of three years supervised release; (3) require McManus to pay a nominal fine; (4) order McManus to pay a special assessment of $800; and (5) order McManus to pay full restitution to the victims of the fraud scheme, including a large up-front sum due immediately.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

DAVID L. AXELROD
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Government's

Sentencing Memorandum has been served on the following:

A. Jeff. Ifrah
Ifrah Law
1717 Pennsylvania Avenue, N.W., Suite 650
Washington, D.C. 20006

Lisa A. Mathewson
123 S. Broad Street, Suite 810
Philadelphia, Pennsylvania 19109

DAVID L. AXELROD
Assistant United States Attorney

Date: October 2, 2014