IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| MATTHEW MCMANUS | : | CRIM. NO.  12-190-2 |

**SENTENCING MEMORANDUM OF DEFENDANT MATTHEW McMANUS**

Defendant Matthew McManus, through his counsel, respectfully submits this Memorandum in aid of his upcoming sentencing.

Mr. McManus accepts that he will be punished, and that his punishment will be severe. He submits this Memorandum not to avoid punishment, but to inform the Court's exercise of its statutory authority.  As the Court knows, it must impose a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing.  Mr. McManus respectfully submits that that sentence is 120 months of incarceration, with substantial forfeiture as described below.

Mr. McManus and the government have entered into a stipulation that will significantly streamline the sentencing process:  among other terms, they have agreed to recommend that the Court impose a sentence in the range of 120 to 220 months incarceration.  *See* discussion below at Section II.A, and Sentencing Stipulation attached hereto as Exhibit "A."  This stipulation is important for a number of reasons – among them the parties' implicit mutual recognition that a sentence in that range is "reasonable."

The defense respectfully submits that a sentence at the low end of that range is the statutorily-correct result, because a ten-year prison sentence is sufficient to accomplish every permissible purpose of punishment.  To put it plainly, ten years is a long time.  During that

1

decade, Mr. McManus' legitimate business will be shelved and possibly eliminated, and his daughters – now ages 9 and 11 – will grow up without him.  A ten-year sentence satisfies the parsimony provision of section 3553(a) because a greater sentence – whether within the parties' stipulated range or otherwise – is not necessary to serve those statutory purposes.

For the reasons explained below the Court should sentence Mr. McManus to 120 months of incarceration, with forfeiture.

## I.        The Law of Sentencing

As the Court knows, sentencing courts must "consider the widest possible breadth of information about a defendant" to ensure individualized sentencing.  *Pepper v. United States*, ___ U.S. ___, 131 S. Ct. 1229 (2011).  Thus a sentencing court must, in every case,

(1)      calculate a defendant's Guidelines sentence;

(2)      rule on any departure motions; and

(3)      set the sentence by considering the sentencing factors prescribed in 18 U.S.C. § 3553(a), regardless of whether that sentence varies from the Guidelines sentence.

*United States v. Arrelucea-Zamudio*, 581 F.3d 142, 146 (3d Cir. 2009).

The only correct sentence is the lowest sentence sufficient to satisfy the purposes of sentencing.  *Kimbrough*, 552 U.S. 85, 101 (2007); 18 U.S.C. § 3553(a) ("parsimony provision").  A sentencing court may not treat a Guidelines sentence as inherently superior to, or more reasonable than, a non-Guidelines sentence.  *See, e.g., Nelson v. United States*, 555 U.S. 350, 351 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are not to be *presumed* reasonable.") (emphasis in original); *Gall v. United States*, 552 U.S. 38, 50 (2007).

## II.  A Sentence Of Ten Years Is Sufficient But Not Greater Than Necessary To Serve The Purposes Of Sentencing, And Thus Is The Correct Result Under § 3553.

### A.  The Parties' Sentencing Stipulation, and Its Significance

#### 1.  The Terms of the Stipulation

The parties' stipulation avoids what would otherwise have been protracted and thorny

litigation on several issues.  *See* Sentencing Stipulation, attached hereto as Exhibit "A."

Specifically, Mr. McManus has now waived:

- his objections to the Guidelines calculations, which would otherwise have required the government to prove, and the Court to address, the calculation of actual and intended loss, among other issues;

- his objection to restitution, which would otherwise have required proof and a determination of actual loss;

- his opposition to the government's Motion for Forfeiture, which Mr. McManus challenged on the basis that the Indictment did not give notice of the government's intent to proceed under pursuant to 18 U.S.C. § 981(a)(1)(C);

- his right to appeal (which waives the issues preserved at trial and in post-trial motions)[1]; and

- his right to collateral attack.[2]

Mr. McManus has also secured his spouse's consent to the forfeiture of her interest in

two properties (with approximately $1.2 million in equity between them) that she owns jointly

with Mr. McManus.  That consent will facilitate the conversion of the forfeiture order into

---

[1]    The stipulation preserves Mr. McManus's right to appeal a sentence that exceeds the statutory or Guidelines maximum (here, 1020 months).

[2]    As required by Pennsylvania Bar Ass'n Legal Ethics and Professional Responsibility Committee Formal Opinion 2014-100, 36-JUN Pa. Law 52, Mr. McManus engaged separate counsel (Barry Boss, Esquire, of Cozen O'Connor) to advise him about his waiver of his right to collateral attack.

substantial funds that may be applied to restitution.  *See generally* 28 C.F.R. Part 9 (governing remission of forfeited funds to victims).

### 2.        The Significance of the Stipulation

Mr. McManus's waivers will secure finality in this matter, conserve judicial and government resources,[3] and begin the lengthy process – to which Mr. McManus is committed – of making the victims whole.

Equally important, the Sentencing Stipulation demonstrates the parties' assent to several key points.  First, it demonstrates the government's implicit agreement that a sentence of ten years would be "reasonable"; that is, would serve the statutory purposes of sentencing: deterrence, incapacitation, rehabilitation and retribution.  The Court's statutory mandate is to impose the lowest sentence that serves those purposes – not to choose among multiple "reasonable" sentences.[4]  18 U.S.C. § 3553(a); *e.g.*, *Rita v. United States*, 551 U.S. 338, 354 (2007).  Second, the stipulation demonstrates the government's implicit agreement that a Guidelines sentence is unwarranted in this case; that is, that a Guidelines sentence would be greater than necessary to serve the purposes of sentencing, and thus improper under § 3553(a).[5]

---

[3]       The Court may wonder why the resources expended on a trial could not have been conserved as well.  Setting aside the constitutional question for the practical one, the defense wishes the Court to know (now that negotiations have ended) that the government's pretrial plea offer would have yielded a sentencing range of 135-168 months, or more than eleven years at the bottom end of the range – a higher minimum than the government currently agrees is reasonable.  Mr. McManus's decision to decline that offer and exercise his Sixth Amendment rights did not represent a reckless misuse of the judicial system's time and resources.

[4]       That is, "reasonableness" is an appellate standard only.  Although multiples sentences may be "reasonable," only the lowest among them satisfies the parsimony provision.  The government's Sentencing Memorandum reflects its implicit agreement that any sentence within the stipulated range will satisfy the purposes of sentencing (i.e., be "reasonable") referring to its proposal of 220 months as the "most appropriate" sentence but not as the minimally-sufficient sentence.  Government Sentencing Memorandum ("Gov. Mem.") at 14.

[5]       There is an emerging judicial consensus that the loss table in Guidelines Section 2B1.1 produces unduly harsh sentencing ranges that bear little or no connection to culpability.  *See*

Third, the stipulation demonstrates Mr. McManus's acceptance of the gravity of the wrongs done to the victims; his acceptance of his role in those wrongs; and his relinquishment of the rights that protect him personally, in favor of a commitment to righting the wrongs as best he can.  Mr. McManus approached the government (not vice versa) about the possibility of this stipulation – even proposing the waivers that relinquish so much.  Mr. McManus's acceptance of a ten-year sentence without hope of future relief speaks volumes about his intention to move past defending himself into making "restitution" – both literal restitution to the victims, and figurative restitution to society.

The government's Sentencing Memorandum gives short shrift to the stipulation, merely summarizing in a single sentence three of its provisions without even mentioning Mr. McManus's significant waivers.  Gov. Mem. at 14.  It accuses Mr. McManus of showing "no sign of remorse," and calls him "completely unwilling to accept reality and take responsibility for his actions."  Gov. Mem. at 1, 18.  Mr. McManus will walk into Court within days of this filing, proposing that he serve ten years in prison and forfeit $1.2 million in real estate equity for the benefit of the victims.  He has volunteered to refrain from ever again asking a court to

---

*United States v. Cursoy*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring).  Here the Guidelines recommend imposing on Mr. McManus, a first-time, non-violent offender, a prison term substantially longer than that recommended for, for example:

- Assault with intent to commit murder (U.S.S.G. § 2A2.1, offense level 27);
- Kidnapping (U.S.S.G. § 2A4.1, offense level 32);
- Arson creating a serious risk of death or bodily injury (U.S.S.G. § 2K1.4, offense level 24);
- Manslaughter (U.S.S.G. § 2A1.3, offense level 29); and
- Unauthorized acquisition of and threat to use nuclear and biological weapons and other weapons of mass destruction (U.S.S.G. § 2M6.1, offense level 30).

The notion that Mr. McManus would be punished at or above the same offense level as someone who acquires and threatens to use a nuclear bomb illustrates the impropriety of imposing a Guideline sentence in this case – as both parties recognize.

enforce his constitutional rights in this matter.  Against this backdrop, the government's

characterization of Mr. McManus's state of mind rings hollow.  "Accept[ing] reality and tak[ing]

responsibility" are the heart of Mr. McManus's consent to the Sentencing Stipulation.

> **B.**     **The 3553(A) Factors That Warrant A Sentence At The Bottom Of The
> Stipulated Range.**

Mr. McManus stands convicted.  At this stage his guilt is not in dispute.  Now the Court's

gaze broadens to encompass the defendant's background and the context for the offense.  The

fact of Mr. McManus's guilt does not define the punishment that will suffice.  The Court must

"consider every convicted person as an individual and every case as a unique study in the human

failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*Pepper*, 131 S. Ct. at 1240 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

> **1.**     **The Nature and Circumstances of The Offense and Mr. McManus's
> Personal History and Characteristics**

While the government has emphasized Mr. McManus's material success and comfortable

upbringing, Mr. McManus has worked hard from a very young age.  Mr. McManus' father notes

that "raising four boys put a strain on the family budget."  As a child Mr. McManus delivered

newspapers by bicycle and later held lawn care and restaurant jobs to help pay his way through

college.  When he was still in his teens he started a business detailing boats.  *See, e.g.*, Letters of

Edward McManus, Tab 97; Barbara C. Hall, Tab 66, Meghan Lawliss, Tab 83, and Claire

McManus, Tab 96.[6]  Even during the relative freedom of a post-college year in Colorado and

Hawaii Mr. McManus held several jobs.  And when that year was over, Mr. McManus was "the

---

[6]     The defense will deliver a complete set of sentencing letters to chambers and to the
government, but is not filing them electronically as exhibits to this Memorandum.

voice of reason" who convinced his then-girlfriend Jennifer Burman to move home to be near family and begin their lives as adults.  Letters of Jennifer Burman McManus, Tab 98; Carol Burman, Tab 27.

The Court already knows that Andy Bogdanoff recruited Mr. McManus to Remington Financial Group when Mr. McManus was still relatively young, and in his first real job after college.  Ironically, Mr. McManus was the first of the "kids" whom Bogdanoff brought into the Remington fold.

Also ironically given the nature of the offense, Mr. McManus eventually built an industry-wide reputation for successfully closing complex and novel real estate deals.  He hastens to add that he is painfully aware of the contrast between his legitimate professional success and the conduct for which he was convicted.  Mr. McManus is not defending in this context the actions for which he will be sentenced.  He is providing for the Court's evaluation the broader picture of his professional life and character that the Sentencing Reform Act commends the Court to consider.[7]

Indeed many colleagues of Mr. McManus in the real estate industry have taken the time to write to the Court.  Their letters reflect their opinion of Mr. McManus as knowledgeable,

---

[7]     Mr. McManus also notes his significant legitimate operation in response to the Probation Office's observation that the continued operation of his business presents a third-party risk. Presentence Investigation Report at ¶ 73.  That observation misconstrues the facts.  The Indictment itself reflects that Mr. McManus's participation in the conspiracy ended in 2008, a fact also reflected in the Probation Office's loss calculation, which omits Remington revenue from later years.  The trial evidence drew a sharp contrast between the service afforded Mr. McManus's own clients and that afforded Arizona-originated clients.  The fact that Mr. McManus has continued to serve his own clients post-conviction does not represent a continuation of the scheme; it represents a continuation of his legitimate business.  As also noted below, from roughly the time of Mr. McManus's indictment until his conviction, Greenbridge Real Estate Capital closed approximately $300 million in legitimate transactions. Letter of R. Christopher Datz, Tab 41.

competent, professional, respectful, diligent and honest. Bruce Batkin of Terra Capital Partners, who partnered on multiple transactions with Mr. McManus, explained that Mr. McManus "is among the most respected and well liked mortgage brokers with whom we deal." Letter of Bruce Batkin, Tab 13. Scott Homel of Homel-Pintzuk Brown Realty Group wrote that he knows over a dozen investors and developers who worked with Mr. McManus on multiple occasions, and in 26 years has never heard a bad word uttered about Mr. McManus. Letter of Scott Homel, Tab 70. Douglas Palermo of Walton Street Financial notes that Mr. McManus was well-respected in the institutional market for his ability to transact sophisticated capital structures. Mr. Palermo notes that he entrusted Mr. McManus with large sums of money on several occasions, a credit to Mr. McManus's honesty and integrity. Letter of Douglas Palermo, Tab 112. Clark Briner of Revere Capital found Mr. McManus to be honest and fair, even when on opposite sides of a negotiation. Letter of Clark Briner, Tab 24.

Richard N. Wiener, an attorney in New York, was struck by the respect everyone showed to Mr. McManus in one particularly difficult transaction. "It was clear to me that these funding sources relied heavily on Matt's honesty, his knowledge of the transaction and sense of fairness." Letter of Richard N. Wiener, Tab 167. *See also* letters from Leonidas Addimando, Tab 2; Joseph Ambrose, Tab 6; Carlos J. Bonilla, Tab 22; Robert Charney, Tab 36; Daniel B. Lambert, Tab 79; Richard A. Swartz, Tab 144.

His colleagues note Mr. McManus's honesty and integrity, even when it meant walking away from a deal. When Sam Sklaroff was looking for funding for a real estate project, Mr. McManus was upfront about his prospects and suggested restructuring the opportunity rather than accepting less favorable financing. Letter of Sam Sklaroff, Tab 135. The colleagues' letters reflect that as a professional Mr. McManus focused on building long-term relationships. Dan

8

Cooperman, a commercial real estate developer, noted that Mr. McManus's focus "has always been on putting the right parties together for the long term, not just for the purposes of getting a deal closed," and further stated that "all of the deals that I closed where Matt was the broker have resulted in fruitful, long lasting relationships for me and the borrowers he brought to me."  Letter of Dan Cooperman, Tab 40.   Michael Gardner of CCRE closed approximately twelve deals through McManus's efforts and referred numerous clients to him, all of whom were impressed by Mr. McManus and called to thank Gardner.  Letter of Michael Gardner, Tab 57.

Indeed, many of the people with whom Mr. McManus worked thought highly enough of him to join him in business.  A year after Mr. McManus told him that he could not help him finance a project, Sam Sklaroff joined Bluestone as Chief Operating Officer. Letter of Sam Sklaroff, Tab 135.   R. Christopher Datz utilized Mr. McManus in financing numerous real estate acquisitions, and then joined Mr. McManus's Board of Advisors for Bluestone Real Estate Capital.  Even after Mr. McManus's indictment, Mr. Datz followed him to Mr. McManus's new firm, Greenbridge Real Estate Capital.  Mr. Datz wrote that, based on his personal experience working with Mr. McManus over a period of five to six years, he "felt comfortable putting my own good reputation at risk to work with what I considered to be the best."  Letter of R. Christopher Datz, Tab 41.

His colleagues' faith in Mr. McManus was so strong that they continued to transact business with him even after he was indicted.  From roughly the time of Mr. McManus's indictment until his conviction, Greenbridge Real Estate Capital closed approximately $300 million in legitimate transactions. Letter of R. Christopher Datz, Tab 41.

Mr. McManus is known for being generous with his time and expertise, even when a given deal was not appropriate for his direct involvement.  Scott Orens, of Orens Brothers Real

Estate, noted that McManus was always "upfront and informative with his knowledge," and "willing to share information and ideas on the best way to go about sourcing financing, even where [Mr. McManus] did not stand to benefit." Letter of Scott Orens, Tab 111. Steven M. Sumberg, a real estate developer in Washington, DC, relied on McManus's advice on a number of real estate loans over the years without ever being asked for compensation. Letter of Steven M. Sumberg, Tab 143. Mr. Datz relied on McManus's uncompensated advice for numerous deals that were too small for McManus to handle directly. Letter of R. Christopher Datz, Tab 41.

That same selflessness has led many to view Mr. McManus as a mentor. Henrik Werring recounts that Mr. McManus was there for him when Mr. Werring's marriage started to fail. Letter of Henrik Werring, Tab 163. Others explain that Mr. McManus gave them opportunities to build or restart careers in real estate finance. John Banas recalls that Mr. McManus gave him an opportunity to renew his career in real estate after his sold his business in 2005. Letter of John Banas, Tab 11. Kristopher Wood will never forget that Mr. McManus took a chance on him right out of business school and taught him the real estate finance business. Letter of Kristopher Wood, Tab 176. A long-time friend of Mr. McManus's wife relied on Mr. McManus's advice during a time of job transition. "He was a true mentor." Letter of Brendan Miller, Tab 108. In many cases, Mr. McManus's professional relationships grew into friendships, based on respect and shared values. One relationship that did so is Mr. McManus's with Dan Cooperman. "While I have been in this business for close to 20 years, I can count on one hand the number of friendships that my professional life has spawned," says Mr. Cooperman. Letter of Dan Cooperman, Tab 40.

Mr. McManus has even used his professional skills to advance charitable works. Daniel French of Atlantic Housing Foundation, Inc., a 501(c)(3) charitable organization, thanks Mr.

McManus for using his expertise to arrange tens of millions of dollars in financing to support Atlantic's mission of providing affordable housing and social services for low income families. He notes that Mr. McManus helped the organization because of his commitment to its mission, for lower compensation than his efforts warranted.  Letter of Daniel French, Tab 55.   A friend relates that Mr. McManus worked with a client whom others had written off as a "lost cause"; Mr. McManus stuck with him and found him the financing he needed to get his life back on track.  She calls Mr. McManus the kind of person who "doesn't give up on other people."  Letter of Joanne Greenstein, Tab 64.

Nor has Mr. McManus's charitable work been limited to his professional field.  Andrew Martin, of Oppenheimer, Inc. praises Mr. McManus's dedication to numerous charitable organizations, including the Multiple Sclerosis foundation and the ALS Foundation, and describes him as a "generous, caring, selfless man who has always put others needs in front of his own."  Letter of Andrew Martin, Tab 91.  Randy Snyder Maged recounts that Mr. McManus frequently asked Ms. Maged's father, Ralph Snyder, what he could do to help the Philadelphia community, and Mr. McManus came through, giving time and energy to many projects that needed volunteers.  Letter of Randy Snyder Maged, Tab 89.  Brent Goldstein describes Mr. McManus's "huge heart" and notes his unsolicited generosity:  once Mr. McManus somehow learned that Mr. Goldstein was raising money for a cancer foundation and sent a sizeable donation, without a word ever being exchanged.  Letter of Brent Goldstein, Tab 60.  In 2009, Mr. McManus was named "Philanthropist of the Year" by the Congregation Beth Solomon in Philadelphia. Letter of Theresa McManus, Tab 104.

And Mr. McManus's commitment to serving others extends to his most private moments. The outpouring of support from those who wrote letters to the Court make clear that Mr.

McManus is a force for good in his personal relationships – cherished by his family, friends, and the many friends who consider themselves his family.  These letters illuminate Mr. McManus's personal, even mundane interactions – and in so doing, they illuminate the core of the man.

When friends and family describe Mr. McManus, they use words like "good, kind, and decent"; and "sensitive, thoughtful, and warm."  His mother-in-law describes him as "caring considerate, intelligent, sensible, honest, respectful, honorable and loyal."  Letter of Carol Burman, Tab 27.  Close friends describe Mr. McManus as "uniquely present in conversations and ready to help in any way he can."  Letter of Barbara and John Burgess, Tab 26.  His friends recognize him as someone who genuinely cares about people: "not just his wife and two daughters but the well being of his entire family, friends and anyone that he came in contact with."  He "treats everyone with respect and affection," and is generous with his time and his hospitality, opening his home to visitors and for school parent meetings and fundraisers.  Letter of Jon Langer, Tab 80.  He welcomes his children's friends into his circle with genuine warmth, and is a "big-hearted fixture" in the community.  Letter of Pamela Metro, Tab 107.  A long-time friend notes his "joy of life, his inclusiveness, his dependability, his compassion and his kind words."  Letter of Janine Brumbach Snavely, Tab 136.  A friend of the family notes that he has "never seen him angry, raise his voice, lose his temper or ever talk in a negative way about anyone." Letter of Alan White, Tab 164.  Mr. McManus's father-in-law attests that he has never met anyone, including highly-accomplished individuals, who better personifies the golden rule of "Do unto others as you would have them do unto you."  He observes of Mr. McManus, "[a]s a husband, father, son, brother, uncle, friend and business associate, he walks and acts with honor compassion and love."  Letter of Robert Burman, Tab 30.  Long-time friend Melissa Wolfson sums Mr. McManus up as follows:  "My parents have always told me that you can tell a lot about

a person from the length of time that they have sustained friendships. You will see that many of Matt's friends have been in his life for 20+ years… a true testament to the kind of person he is." Letter of Melissa Wolfson, Tab 175.  His brother Kieran says more succinctly that "Matt shines a bright light wherever he is."  Letter of Kieran McManus, Tab 99.

Other writers provide concrete examples of Mr. McManus's selfless contributions to the lives of others. Mr. McManus:

- stayed by the side of a co-worker and friend during her ordeal with cancer – Mr. McManus is "the kind of friend that is there for you in the darkest days."  Letter of Roseanne Martin, Tab 92.

- was one of the few friends who did not abandon Jennifer DeMaria when her son was diagnosed with autism.  Letter of Jennifer DeMaria, Tab 42.

- delivered numerous meals and arranged play dates for the children of a neighbor whose wife was diagnosed with cancer.  Letter of Matthew Rutt, Tab 124.

- was among the first to reach out to a long-time friend of Mr. McManus's in-laws when he lost his wife to cancer, and traveled to Connecticut to pay his respects and offer condolences. Letter of Barry Lieberman, Tab 85.

- spent hours talking, listening to and counseling his sister-in-law during a difficult divorce, and helped to mentor her eighteen-year-old son.  Letter of Amanda White, Tab 165.

- spent days with a close friend's family, helping them cope following the sudden loss of the friend's father-in-law.  The same friend recalls that Mr. McManus visited her husband in the hospital following surgery, and helped a friend's husband find a job and get on his feet.  Letter of Andrea Picard, Tab 117.

- went back onto the water immediately after returning from a boating trip to search for the missing son and grandson of a distraught stranger he met on the dock.  Letter of Robert Burman, Tab 30.

Nor can Mr. McManus's role in his family be overstated.  He is the "emotional anchor" of his family.  Letter of Barbara Burgess, Tab 26.  He takes charge of organizing family events, including an annual Thanksgiving get-together, and hosts his extended family every Christmas at his home.  The eldest of four sons, Mr. McManus is "the brother on whom the other brothers rely

in good times and in difficult times.  Matt is the one who is always there for the others."  Letter of Cathryn L. Thorup, Tab 147.  *See also*, Letter of Theresa McManus, Tab 104. When a younger brother struggled with addiction, Mr. McManus orchestrated an intervention, and continues to support his recovery.  His brother Kieran recalls that when his hearing aids broke while he was in college, Mr. McManus came to the rescue, sending him an encouraging message and a check to purchase new ones.  Letter of Kieran McManus, Tab 99.

Longtime neighbor Michael J. Cascio describes Mr. McManus as the "consummate" family man:  a dedicated father and devoted husband.  Letter of Michael J. Cascio, Tab 34. Friends describe Mr. McManus and his wife of twenty years, Jennifer, as "best friends," and "soul mates."  Many attribute the strength of the McManus' marriage to Mr. McManus's willingness to put the needs of his wife and family before his own, rearranging his work day to schedule calls and respond to e-mails early in the morning, even commuting weekly from Boston to Philadelphia. When not on the road visiting family, Mr. McManus is "at home, hanging out in the yard with the girls, doing home improvements." *See, e.g.*, Letters of Mary Anne Vitty, Tab 152; Nadia B. Penza, Tab 114; Erin C. McLoughlin, Tab 94; Jennifer Burman McManus, Tab 98.  "I do not know many marriages that are as strong as theirs."  Letter of Nadia B. Penza, Tab 114.

Jennifer McManus reflects that from the day she met Mr. McManus in 1991, "he has treated [her] family like his own," and this sentiment is clearly reciprocated.  Mr. McManus's mother-in-law and father-in-law, Carol and Robert Burman, view him as not just a son-in-law, but a son.  Robert Burman says that Mr. McManus "earned [his] love by his kindness, his wisdom, his love of my family, and most important his sense of honor and fairness in life." Letters of Jennifer Burman McManus, Tab 98; Robert Burman, Tab 30; and Carol Burman, Tab

14

27.  Mr. McManus's wife notes that "[h]is friendship and relationship towards his own parents and three younger brothers is enough to make any mother, wife, person proud, but how he goes above and beyond with my sisters, parents, nieces, cousins, aunts and uncles is remarkable.  My friends notice it too.  They comment on how lucky I am and how lucky our daughters are to have such a kind and committed man in our lives."  Letter of Jennifer Burman McManus, Tab 98.

Both Mr. McManus and his wife are "caring and down to earth" and able to "relate to everyone regardless of any personal differences."  An example of Mr. McManus's openness and respect for all people is his commitment to honoring his wife's faith, raising their children Jewish even though he was raised Catholic.  Friends see this as a lesson to his children to be "open and caring of everyone." Letter of Joanne Greenstein, Tab 64.

Indeed Mr. McManus's devotion to his two daughters, Eliza (age eleven) and Ava (age nine), stands out to many.  Friends note that he "shower[s] them with love, guidance and support," and describe his commitment to them as "unparalleled."  Letters of Richard and Kimberly Schoonover, Tab 131; Joanne Orleans Frankel, Tab 54.  Mr. McManus's wife states that "[t]he girls come to life when they see their daddy."  Letter of Jennifer Burman McManus, Tab 98.  The feeling is mutual.  Jennifer McManus's childhood friend Brendan Miller relates how excited Mr. McManus was when his first daughter, Eliza, was born:  "He was so eager to be a great dad.  When I would visit he would always want to take Eliza out with us whether it was running errands, going to have lunch, the pool – whatever it was, he just loved being a dad and having her around like she was the most special guest."  This excitement only grew when Ava was born.  "He would always say things like 'look at these beautiful girls, how great are they?!'"  Letter of Brendan Miller, Tab 108.

Mr. McManus is active in every aspect of his daughters' lives, whether it be making pancakes, going ice skating or just listening.  He attends holiday programs, plays, gymnastic meets and other school events, and is active in school fundraising.  *See, e.g.*, Letters of Donald Gamburg, Tab 56; Suzanne Griffin, Tab 65; Pamela Metro, Tab 107.  As a result "[h]is kids ADORE him … He is "one of the few dads I see at birthday parties with his daughter. And instead of just talking with his peers like some may do, he is always paying attention to his little girl."  Letter of Jacqueline Zivitz, Tab 177.  An elementary school teacher of fifty years describes Mr. McManus as a "master" parent.  Letter of Linda Cafritz, Tab 31.  Mr. McManus's sixteen-year-old niece describes Mr. McManus as a wonderful husband and a loving father, who is never too busy to play with his daughters, nieces, and nephews and who always made her feel special and important.  Letter of Madison Rose Wallach, Tab 157.

Many people rely on Mr. McManus – his brothers, his parents, his sprawling extended family, his wife, and importantly, two young daughters who will grow into women without a father.  In their pleas for leniency, family and friends note their concern for the family.  *E.g.*, Letter of Barbara Burgess, Tab 26.  Kimberly Koslow asks for leniency because she knows firsthand how hard it is to raise two young children as a single mother.  Letter of Kimberly Koslow, Tab 78.  Two mental health professionals who are also friends express concern about the absence of the girls' father during what one calls their "critical, formative years."  Letter of Stacy Wilson, Tab 168; Letter of David Steinke, Tab 140.  Edward Wallach has two teenage daughters and "the thought of being away from them during these crucial years is unbearable."  Letter of Edward Wallach, Tab 155.  Mr. McManus's fourteen-year old niece, Sophie, described last December's vacation without her uncle Matt (who was then preparing for trial):  "I cannot begin to tell you how strange and empty it felt for me….  Our family did not feel complete, and

16

that was just one week out of our lives." "I will always be there for my cousins Eliza and Ava but no one will ever be able to take the place of their dad," she adds.  Letter of Sophie Wallach, Tab 158.  Another niece, Madison, "could not possible fathom getting through all of the normal teenage challenges without my father's advice and love.  Actually, I can't imagine doing anything without being able to share it with my dad."  Letter of Madison Rose Wallach, Tab 157.

Mr. McManus is fully aware that he has himself to blame for his impending absence, and for his family's pain.  These and the other letters submitted to the Court merely illuminate Mr. McManus's character through the high regard that others have for him.  The writers urge the court to look at the whole man: "The whole man including the one who was brought up with religion and ethics; the one who has been part of many professional transactions, the one who has two young thriving children that need a father, the one who has been charitable in his community and to his friends and family, the one who is still young and can atone and rehabilitate."  Letter of Mark Picard, Tab 118.  That is precisely the lens through which the Court should sentence.

### 2.   A Sentence of Ten Years is Sufficient to Serve the Purposes of Sentencing

As explained above, the parties' Sentencing Stipulation demonstrates that both agree that any sentence within the stipulated range will be reasonable; that is, will serve the statutory purposes of sentencing:  deterrence, incapacitation, rehabilitation and retribution.  And the Court's statutory mandate is to impose the lowest sentence that serves those purposes – not to choose among multiple reasonable sentences.[8]  18 U.S.C. § 3553(a); *e.g.*, <u>Rita</u>, 127 S. Ct. at

---

[8]     That is, "reasonableness" is an appellate standard only.  Although multiples sentences may be "reasonable," only the lowest among them satisfies the parsimony provision.

2467.  The defense submits that a sentence of ten years is the correct sentence under the parsimony provision.

### (a)     Specific Deterrence, Incapacitation, and Rehabilitation

The goals of specific deterrence, incapacitation, and rehabilitation are closely linked in this case, as in many.  In terms of specific deterrence, Mr. McManus presents an extremely-low risk for recidivism.  Statistically speaking, the low risk is linked to his age (forty-six), educational and employment history, marital status, and the nature of his offense.  See *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, U.S. Sentencing Commission (May 2004); available at http://www.ussc.gov/research-and-publications/research-publications/2004/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines.  Among all offenders (of all offense types) between the ages of forty-one and fifty in Criminal History Category One, the recidivism rate is only 6.9 percent.  With no criminal history at all, plus his non-violent offense, plus all of his other favorable social indicators, Mr. McManus's statistical risk is significantly lower.  And Mr. McManus's statistically-low recidivism risk will be lowered still further by all that he has lost.

Mr. McManus's realistic appraisal of the seriousness of his wrongdoing is reflected in his stipulation to a sentence of at least ten years.  That degree of acceptance should assure the Court that he does not pose a risk of recidivism.

### (b)     General Deterrence

There remains the goal of general deterrence.  Beyond question, deterring serious financial crime is a laudable goal.  Nonetheless, to the vast majority of professionals, the

prospect of suffering what Mr. McManus has and will suffer is terrifying:  a federal prosecution, a federal conviction, the attendant publicity, loss of professional standing, lack of access to credit, loss of accumulated wealth, and a prolonged time away from his family.  No financial professional will view with sanguinity the imposition of *any* sentence within the stipulated range. Nor will an incremental increase in sentence cause a corresponding incremental increase in deterrence.  The U.S. Sentencing Commission itself recognizes that "the definite prospect of prison, even though the term may be short, will service as a significant deterrent."  USSG Chapter 1.A.1 (1987) (Introduction to 1st Ed.).  And here, Mr. McManus has accepted the prospect of a sentence that will *not* be short.  A ten-year sentence properly reflects Mr. McManus's culpability in light of all of the purposes of sentencing, including general deterrence.

### (c)        Reflecting the Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment

That leads to another purpose of sentencing:  retribution, to reflect the seriousness of the offense.   Mr. McManus certainly acknowledges that the community's entitlement to retribution will entail a lengthy prison sentence; he has stipulated to a sentence of at least ten years.  The question is whether society will benefit more from a sentence that exceeds ten years.  The answer, in this case, is no.  Moreover, the cost of imprisonment, and the problem of overcrowding, counsel against imposing a lengthy prison term on a non-violent first-time offender who has an extremely low recidivism risk.  See *Report of the Justice Kennedy Commission of the American Bar Association* (2004) (recommending alternatives to incarceration for all but the most serious offenders), available at

http://meetings.abanet.org/webupload/commupload/CR209800/newsletterpubs/JusticeKennedyC

ommissionReports_Final_081104.pdf.  A sentence above ten years would exact significant societal costs without corresponding benefit.

### 3.      Guidelines Range and Available Sentences

The Presentence Report applies an offense level of 42, driven by Guidelines Section 2B1.1.  But because the Guidelines are advisory and no mandatory minimum sentence applies to this offense, the stipulated range is certainly "available" to the Court.

### 4.      The Need to Avoid Sentencing Disparity

In the service of § 3553(a)(6)'s mandate to avoid unwarranted sentencing disparities, the Court should also avoid unwarranted sentencing similarities between co-defendants whose conduct differed.  *See, e.g.*, Gall, 552 U.S. at 56 (finding no procedural error, and affirming sentence as reasonable, where district court gave lower sentence to defendant who voluntarily withdrew from conspiracy that others continued).  The Court imposed upon Andrew Bogdanoff a sentence that is at the very top of the range that the parties have stipulated is "reasonable" in this case.  The government urges it to impose the same sentence upon Mr. McManus.  But doing so would violate § 3553(a)(6).

The government's suggestion that Mr. McManus requires punishment equal to Mr. Bogdanoff blatantly ignores salient distinctions between them, chief among them this:  Mr. Bogdanoff required incapacitation and specific deterrence, because he continued to commit the same crime even while on bail post-Indictment in this case.  *See* Government Sentencing Memorandum in United States v. Bogdanoff, Crim. No. 12-190-1 (Doc. No. 266), at 14.  Indeed the December 2013 FBI 302s from Mr. Bogdanoff's attempts to cooperate with the government revealed that Mr. Bogdanoff continued to deny, post-plea, having engaged in any fraudulent

conduct – claiming that when he had earlier declared his guilt before the Court he did so only to spare his son imprisonment. *See id.* at 20. As far as the record reflects, Mr. Bogdanoff had not earned a legitimate dollar since 2005 or earlier. He had no means to support himself legally, no understanding of his wrongdoing, and no compunction about manipulating court process to serve his own ends. Other than his bare plea of guilty, the substance of which he subsequently disavowed, Mr. Bogdanoff showed no deference to the law. In sum the Court had no assurance – other than the sentence it imposed – that he would not offend again.

For all of the reasons explained above, Mr. McManus's situation is distinctly different. His pursuit of the Sentencing Stipulation and waiver of all future challenges to his conviction, together with his commitment to making substantial restitution (through forfeiture now, and future income when he has the opportunity), demonstrate his intent to remedy past harm. The solid core of his character and the strong support of his family and community will ensure that he does not offend again. And the ten-year sentence that he proposes will certainly suffice to serve the specific deterrence and other purposes of sentencing.

Having agreed through stipulation that a ten-year sentence would be "reasonable," the government by definition agrees that it would be "sufficient." And the lowest sufficient sentence is the only one that § 3553(a) will countenance. Even if the government believes a higher sentence "more appropriate" (*see* footnote 4, above), when a lower sentence suffices the Court must impose it. To sentence Mr. McManus at the same level as Mr. Bogdanoff would violate §3553(a), and § 3553(a)(6) in particular.

**III.**     **Conclusion**

For all of the foregoing reasons, the Court should impose a sentence of 120 months, with

forfeiture and restitution.

Respectfully submitted,

/s/                            

Lisa A. Mathewson
The Law Offices of Lisa A. Mathewson, LLC
123 South Broad Street, Suite 810
Philadelphia, PA 19109
(215) 399-9592
lam@mathewson-law.com


A. Jeff Ifrah
David B. Deitch
Ifrah PLLC
1717 Pennsylvania Ave NW
Suite 650
Washington DC 20006
(202) 524-4140
jeff@ifrahlaw.com
ddeitch@ifrahlaw.com

Counsel to Defendant Matthew McManus


Date: October 3, 2014

## <u>CERTIFICATE OF SERVICE</u>

I, Lisa A. Mathewson, do hereby certify that on this date I caused a true and correct copy of the foregoing document to be served upon the following counsel via electronic filing:

> AUSA David L. Axelrod
> U.S. Attorney's Office
> 615 Chestnut Street, Suite 1250
> Philadelphia, PA  19106

> /s/ _____
> Lisa A. Mathewson

Date:   October 3, 2014

# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :

      v.         :     **CRIMINAL NO. 12-190**

MATTHEW McMANUS    :

### SENTENCING AGREEMENT

The government, the defendant, and the defendant's counsel enter into the following agreement concerning the sentencing in this case. Any reference to the United States or the government in this agreement shall mean the Office of the United States Attorney for the Eastern District of Pennsylvania.

1.    The parties agree that, as properly calculated under the United States Sentencing Guidelines, the advisory guideline range of imprisonment is 360 to 1,020 months' imprisonment.

2.    The parties agree to recommend, however, that the Court impose a sentence within the range of 122 [*120*] to 220 months' imprisonment. The parties are free to ask the Court to impose any sentence within that range. The request for a sentence outside this range (below or above) by either party will constitute a breach of this agreement. Breach of this agreement [*specific paragraph*] by the defendant will not negate any other provisions of this agreement. 

3.    The parties recognize that the Court has the authority to impose a sentence outside the range of 122 to 220 months' imprisonment. The mere fact that a sentence is imposed outside this range, without conduct which breaches this agreement by one of the parties, does not alone constitute a breach of this agreement.

4.    Nothing in this agreement shall limit the government or the defendant in its comments, arguments, or responses about the application of the factors enumerated in 18 U.S.C. § 3553(a), and other sentencing matters, except as specifically addressed here.

5.    The parties agree and stipulate that McManus owes $17,774,174 in restitution in this matter.

6.    Defendant agrees to withdraw his objection to the government's preliminary motion for forfeiture, and agrees that he will not contest forfeiture.

7.    Defendant agrees to provide the government documents prior to sentencing showing that defendant's wife, Jennifer Burman, has forfeited her interest in the real property comprising: (a) 5 Mattapoisett Avenue, Nantucket, MA; and (b) and 1701 Locust Street, Unit 1705, Philadelphia, PA.

8.    In exchange for the promises made by the government in entering this agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

a.    Notwithstanding the waiver provision above, if the government appeals from the sentence, then the defendant may file a direct appeal of his sentence.

b.    If the government does not appeal, then notwithstanding the waiver provision set forth in this paragraph, the defendant may file a direct appeal but may raise only a claim:

(1)    that the defendant's sentence on any count of conviction exceeds the statutory maximum for that count;

- 2 -

(2)      challenging a decision by the sentencing judge to impose an "upward departure" above the advisory guideline range of 360 to 1,020 months' imprisonment, pursuant to the Sentencing Guidelines; and

(3)      challenging a decision by the sentencing judge to impose an "upward variance" above the above the advisory guideline range of 360 to 1,020 months' imprisonment.

If the defendant does appeal pursuant to this subparagraph, no issue may be presented by the defendant on direct appeal other than those described in this subparagraph.

9.      The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

- 3 -

10.   The defendant is satisfied with the legal representation provided by the defendant's lawyers; the defendant and his lawyers have fully discussed this sentencing agreement and the ramifications of entering into this agreement; and the defendant is entering into this agreement because after consulting with his attorneys he believes it is in his best interests.

ZANE DAVID MEMEGER
United States Attorney

MATTHEW McMANUS
Defendant

PETER F. SCHENCK
Chief, Criminal Division
Assistant United States Attorney

LISA MATHEWSON
Counsel for Defendant

DAVID L. AXELROD
Assistant United States Attorney

A. JEFF IFRAH
Counsel for Defendant

Date: _____

- 4 -